NOVELTY GLASS MFG. CO. v. BROOKFIELD et al.

(Circuit Court of Appeals, Third Circuit. June 1, 1909.)

No. 6, October Term, 1908.

1. PATENTS (§ 328*)—PRESS FOR MAKING GLASS INSULATORS—VALID AND IN-VALID CLAIMS.

The Kribs patent, No. 542,565, for improvements in presses for making screw insulators, although made up of old elements and of narrow scope, was not anticipated and discloses invention; and claim 2, which is accurately expressive of the device is valid, although claim 1 is bad as being too broad, as well as claims 3, 6, 7, and 8, which are merely duplicates of 1, and 2, differentiated by elements necessarily implied or by simple mechanical expedients, which any one could supply. Claim 2 also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 34*)—INVENTION—EFFORTS OF OTHER INVENTORS—SUCCESS OF THE DEVICE.

In judging of invention, in case of doubt, regard may be properly had to the efforts of other inventors in the same field, particularly where there are not a few both before and since, as well as to the difficulties to be overcome and the success of the device, where in the number and quality of the articles produced it has been marked.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 38; Dec. Dig. § 34.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. PATENTS (§ 26*)—COMBINATION AND AGGREGATION—SUCCESSIVE STEPS IN OPERATION OF MACHINE—UNITARY RESULT.

The test as to whether a device is a patentable combination or a mere aggregation of parts having no combined action is whether there is a new unitary result to the production of which the different elements coact; and where this appears it is immaterial that there are different steps in the operation to which the different parts are successively addressed. It is not necessary that the article manufactured shall be produced at a single stroke, in which all the elements are involved.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*]

4. PATENTS (§ 91*)—ORIGINAL INVENTOR—MINOR FEATURES.

Upon conflicting claims of different parties to have been the originator of the invention, the question is whose was the main idea, and the fact that minor features may be attributable to others is not controlling. Evidence examined, and Kribs, and not Jordan or others at the Brookfield Works, where experiments were made, *held* to be the original and first inventor of the device in suit.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 121–123; Dec. Dig. § 91.*]

5. PATENTS (§ 112*)—INTERFERENCE PROCEEDINGS—EFFECT OF IN SUBSEQUENT SUIT.

Where, upon conflicting applications, interference proceedings have been declared, upon which the application of one party is dropped and the other decided to be the original and first inventor, and a patent issued to him, upon a subsequent suit for infringement, in which the same issue is raised, while the interference proceedings are not conclusive, it is for the losing party to overcome their effect.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 162–165; Dec. Dig. § 112.*]

6. PATENTS (§ 176*)—CLAIMS—OMISSION OF ESSENTIAL ELEMENT—DUPLICATION —"MOVABLE MOLD ADAPTED TO TRAVEL."

Where, in a press for making screw insulators, an essential element, to differentiate the prior art, is a rotary table or its equivalent to support the molds and carry them in a fixed and predetermined path to and from other parts of the machine, by which the process involved is carried out, the specification of a "movable mold adapted to travel," although under some circumstances competent to imply a structural arrangement by which the mold is moved back and forth mechanically, in a predetermined way, between designated points, the specific means employed for doing so in the patent in suit being of the essence of the invention, a claim in which it is not made an element of the combination is invalid, as being too broad; or if, disregarding this, the omitted element is read into the claim as being implied, it will also be bad where, as here, it thereby duplicates another claim.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 251–252; Dec. Dig. § 176.*]

7. PATENTS (§ 318*)—INFRINGEMENTS—ACCOUNTING FOR PROFITS FOR USE OF INFRINGING MACHINE—MEASURE OF—SAVING THEREBY OVER USE OF OTHER NONINFRINGING MACHINES.

In an accounting for profits for the use of an infringing machine, the patent not being for the product, but for the machine itself, the complainant is entitled merely to what was saved to the defendants by the use of the patented machine over others which were open to them to use; that is to say, in the present instance, the difference between the cost of insulators as made by the machine of the patent and the cost as made by other machines which had gone into public use which it displaced. But where, according to the evidence, salable articles at the market prices could not be so made without loss, the whole profit on such arti-

cles made by the use of the infringing machines may properly be taken as having been so saved.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

8. PATENTS (§ 318*)—INFRINGEMENT—ACCOUNTING FOR PROFITS—NONESSENTIAL FEATURES NOT USED.

Incidental, but nonessential, features not used, which do not enter into the profits made, although contributing possibly to the general efficiency of the patented machine, do not need to be considered in the result.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

9. PATENTS (§ 312*)—ACCOUNTING FOR PROFITS—WILLFUL AND DELIBERATE INFRINGEMENT—BURDEN.

Where an infringement is deliberate, with every means taken to avoid being responsible for it, if there · is· any uncertainty on the subject of profits made, it is for the defendants, and not the complainant, to clear it up.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 545; Dec. Dig. § 312.*]

10. PATENTS (§ 318*)—ACCOUNTING—USE OF INFRINGING MACHINE AS DISTINGUISHED FROM INFRINGING SALES—PROFITS FROM SINGLE DISTINGUISHING NONINFRINGING FEATURE.

Although the difference between an infringing and a noninfringing machine may consist of a single feature, the profits recoverable upon an accounting for the use of such machine are not to be confined to the saving secured by this one feature. Infringement being of the whole machine, and the defendants having got the benefit, not of one feature, but of the whole, it is not to be divided around. It is not as though they were being charged for infringing sales, where the profits recoverable would properly be so limited.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

11. PATENTS (§ 226*)—INFRINGEMENT TO BE JUDGED BY STATE OF ART AT THE TIME.

Infringement is to be judged by the state of the art when it took place. and not by something which has been brought in since, and is not, therefore, to be stated in terms of such subsequent device. Nor, in holding the defendants liable for profits on the use of the infringing machine, can it be said that they are made responsible for the improvements so subsequently introduced.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 357; Dec. Dig. § 226.*]

12. PATENTS (§ 318*)—INFRINGEMENT—PROFITS.

While courts of equity will do nothing directly or indirectly to aid either party to realize or recover fruits of a transaction prohibited by law, it is immaterial, in the present case, that the defendants' profits may have been enhanced by a combination in restraint of the trade in glass insulators, in violation of the Sherman anti-trust act, which 'combination was negotiated by Mr. Brookfield, the controlling stockholder in the Brookfield Glass Company, one of the participating parties; the illegal contract having been fully executed, and the complainants not having to set it up or rely upon it in order to recover, which is a test, the law under such circumstances leaving the parties where they are.

· [Ed. Note.—For other cases, see Patents, Dec. Dig. § 318.*]

13. PATENTS (§ 318*)—INFRINGEMENT—PROFITS.

Neither could the complainants be made responsible for the illegal agreement charged, whatever be its character, or whatever stage it had reached; the Brookfield Glass Company being the party who got the bene-

fit of it, and not Mr. Brookfield, the complainants' testator, even though he may have assisted in bringing it about.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 318.*]

Appeal from the Circuit Court of the United States for the District of New Jersey.

Joseph C. Fraley and Walter H. Bacon, for appellant.

John G. Johnson and Robert N. Kenyon, for appellees.

Before GRAY and BUFFINGTON, Circuit Judges, and ARCHBALD, District Judge.

ARCHBALD, District Judge. The patent in suit—or at least the one with which we are particularly concerned—was issued to Seraphin Kribs, July 9, 1895, for a press for making screw insulators for use on telegraph and other electric lines to support and insulate the wires. These insulators are of glass, with an interior central screw thread impressed upon them while in a molten state, by which they are secured in place on screw pins affixed to the crossarms of the supporting poles. The patent was sustained and found infringed by Judge Bradford ([C. C.] 124 Fed. 551); and, upon an account being taken profits, realized by the defendants, amounting to $29,910.48, were allowed to the complainants by Judge Lanning, but damages, additionally claimed to the extent of $54,701.08, were refused ([C. C.] 170 Fed. 830); and there is an appeal in consequence by both parties.

Infringement is conceded, and the liability of the defendants depends, therefore, on the validity of the patent. Its validity is denied on the ground that the device covered by it is a mere aggregation of old and familiar elements, which it involved no invention to put together; or if, notwithstanding this, invention be found, that the credit of it belongs not to Kribs but to Jordan, or to perhaps no one person in particular, being the combined idea of different parties at the Brookfield factory, where the patentee was a workman.

The making of glass insulators is beset with some difficulty, and requires considerable observation and careful management, due in large measure to the fact that the molten glass must be at just the right temperature at different stages of the operation; and the particular difficulty experienced in the production of the kind in question consists, while shaping them accurately, in keeping them free from superficial cracks and "shrends," where water will lodge and form a conducting path for the escape of the electric fluid, which is liable to occur with the powerful currents at present carried. The object of the invention was to improve the character and quality of such insulators in this respect, and at the same time to increase and thus cheapen the output. And the success in both directions which it attained, which was quite marked, having completely monopolized the field until the introduction in 1903 of the Duffield improvement, is one, if not the main, reason urged in its behalf.

The device consists substantially in a rotary table or movable support carrying a suitable number of molds in which the insulators are formed; a detachable screw plunger, which, by a single downward

thrust, is forced into the molten glass, by means of an actuating rod to make the screw thread, the rim or petticoat of the insulator being at the same time pressed into shape by a former and follower above the plunger, on the end of the actuating rod; a rotary spindle to withdraw the plunger, after it has remained a sufficient time to set the glass, the plunger being so arranged as to be easily and quickly brought into engagement with and attached to the actuating rod, and be easily detached therefrom and brought into engagement with the rotary spindle, by which it is removed; the different parts being so further coördinated and assembled that the molds shall be carried from the screw pressing mechanism to the removing spindle and back within a certain time, and in a fixed and predetermined path, so as to produce definite and desirable results.

The operation of the machine conforms to the mechanism employed, and so proceeds that at every step the several workmen at each machine are simultaneously engaged upon different points in the process, the insulators, in consequence, being turned out with a minimum of imperfections, expeditiously and in complete form. Thus the gathering boy measures out the glass and pours it into the mold. The presser sees that it is brought under the actuating rod, and by means of a lever brings down the screw plunger, which he detaches and leaves in the glass, the edge of the insulator being at the same time, and by the same act, pressed into form by the former and follower, which are promptly withdrawn, so as not, by too long contact, to overcool and crack the glass. The mold with the screw plunger is then passed on by the revolution of the table to the boy at the rotary spindle, which is located a sufficient number of molds off to have the glass properly set, and the plunger is then screwed out, and, with another partial revolution of the table, the mold goes to another boy, who opens it and takes out the completed insulator, which brings the operation around to the beginning to be gone over again. This, however, is the mere mechanical side of the process, which calls for judgment as well, and can only be carried to a successful issue where due regard is had at all times to the relative temperature of the glass and the plunger at different points, which has therefore to be carefully watched. This varies not only on different days, but at different times of the same day, and necessitates the use of a greater or less number of plungers to correspond. And it is in the adaptability of the machine to this requirement that its chief merit, if not its real claim, to invention consists.

But as is well said in Brookfield v. Elmer Glass Works (C. C.) 144 Fed. 418, 421, a suit on the same patent against another defendant, the novelty as well as the virtue of the invention depends on the machine as a whole, or at least on its predominant features, no one of which can be spared in the account. Invention does not reside, for instance, in the detachable screw plunger, however that may be an essential and distinguishing part (Brookfield v. Elmer Glass Works, 154 Fed. 197, 83 C. C. A. 180); nor in the actuating rod by which the screw thread is formed with a single downward thrust, although undoubtedly a point of great merit; nor in the separate rotary spindle, by which the plunger is screwed out after the glass has set; nor yet

in the molds adapted to travel from the one to the other in a carefully timed course, nor in the movable support by which this is brought about; but in the combination or united effect of them all in the one conjoined mechanism, with such additional incidental appliances as are necessary to produce efficient work. We are not prepared, in view of this, to sustain any broad claim; nor, on the other hand, to sanction any which are merely differentiated by simple mechanical expedients which any one could supply, or by elements necessarily implied. But these things aside, taking the device as a whole, according to which it is entitled to be judged, invention, as we think, is disclosed.

Admittedly there is nothing which exactly anticipates it in the prior art. The separate features of it may be there, but not brought together into one machine. In the Brookfield (1871) patent, for instance, taken out by the original complainant, assignee of the patent in suit, a detachable plunger was used, which was pressed, as here, into the molten glass, in a single downward thrust, by means of an actuating lever or rod. The screw plunger, being then detached, was also left in the mold until the glass had set, and was subsequently removed by any suitable means, as it is said, a screw spindle being among those named. Three distinctive features of the present invention thus appear: A detachable screw plunger impressed into the glass by an actuating lever to make the screw thread; movable molds in which the plunger remains until the glass is set; and a rotary spindle by which, after a proper interval, the plunger is removed. The use of two or more plungers, which was thus made possible, is also recognized, and as many molds as were found necessary to dispense with screwing out the plunger until the glass had cooled. But there was no rotary table or movable support, by which the insertion and removal of the plunger could be effected by the same machine; nor any correlation of the two operations by separating them a certain number of molds apart, by which the glass could be allowed to cool and set to just the right extent. The failure to appreciate the advantage of this necessitated the use of two machines, one at which the plunger was inserted and the other at which it was taken out, the molds being carried from one to the other by hand, a by no means easy job, the molds weighing from 40 to 60 pounds apiece. This step in the process not being able, therefore, to be accurately timed, the insulators were liable to be spoiled if it happened at any time to be either too long or too short. The Brookfield was thus never a successful machine, and, after repeated efforts to improve upon it at the Brookfield factory, it was given up, and the process which had previously prevailed under the Homer Brooke (1870) patent was resumed and continued down to that of the patent in suit. According to the practice under the Brooke patent and the modification of it known as the "Brookfield process," a plain plunger, actuated by a lever, was first forced down into the glass by a single quick thrust, the end of it being so shaped as to form a countersink as well as a small hole in advance of that where the screw thread was to be subsequently made. The mold was then taken to a second machine, and, by means of a screw press or rotary spindle, a second plunger, having a screw tap extension, was screwed into the hole

already formed, and a screw thread cut, the main or enlarged end of the plunger being used to retain the form of the countersink into which it fitted and pressed, while the screw tap extension made the thread. But the screw plunger was not detachable, as in the patent in suit, although it could be taken off when required to be removed by reason of wear or otherwise, and had thus to be left in the mold until the glass had cooled, and then rotated or screwed out. In the modified Brookfield practice, the bulging end of the screw plunger was made smaller than the countersink, so as not to come into contact with the glass when being screwed in and out, the rim of the insulator being liable to be twisted or cracked if it did, a difficulty appreciated and similarly remedied in the A. P. Brooke (1871) patent. Except as expressive of the state of the art at the time of the present invention, and as showing a rotary spindle in use for screwing the screw plunger in and out, there is nothing of any particular significance in this device. Neither is there in the Krell (1884), more than that it further shows a rotary table to carry the molds from the place of inserting the screw plunger to that of its removal, a not uncommon expedient in the glass-making art to convey an article progressively and in collective numbers through the successive steps of an operation, the recognition of this common feature in use in the same connection and for the same purpose, as in the patent in suit, being the only thing in it with which we are concerned. The Hemingray process (unpatented), which was also practiced for a time at the Brookfield factory, in the hope of making something out of it, while having some suggestive features, stopped considerably short of the machine of the patent. The screw plunger was detachable, the same as here, and was forced into the molten glass by means of a lever, in a single downward thrust to form the thread, and, after being left in the glass for a suitable time, was removed by a spindle by which it was screwed out. But the same as the Homer Brooke, it was a two-machine arrangement, the first one having nothing but the actuating rod and the detachable screw plunger, and the other the removing spindle; the heavy molds, as in the Brookfield, having to be shoved along the intervening table from one to the other, and centered under each, by hand, a slow and laborious process which soon discredited it. The Hemingray people recognized the advance over this, which was made by the Kribs machine, which they found it necessary to adopt in order to compete with the Brookfield Company, and after infringing for a while they took out a license, which is still in force. It is sought to lessen the effect of this by the suggestion that the license is conditioned on the result of this suit; but so far as that is the case it is not an unusual arrangement, and does not in any event detract from the concession made to the novelty and importance of the Kribs device. There is nothing in particular to stop over, in the so-called "New England press," which was also in use, along with others, shortly before the present invention, at the Brookfield shop. Like the Krell, it had a rotary table, which revolved about a central standard upon which the actuating rod was hung, the same as in the patent in suit, but the plunger was permanent and not detachable, and just how or

when it was removed is not made clear. It is only to be noticed because of the argument that the inventor got the idea of a rotary table from it, which is not important, although it may be so.

But while there were these different features, with practically the same functions, employed in much the same way, at hand in the art, on which no doubt the inventor freely drew, they had not been brought together previously in one device; nor, with them all, was there a really successful machine. It remained for Kribs, or whoever is to be credited with the idea, to appreciate that, by assembling and coördinating them in the way that was done, the results which followed could be secured, the value and success of which the sequel attests and every one concedes. And it affirms rather than lessens the achievement that the different parts were brought together from the company's scrap heap, to which they had been consigned, if that is the way it came about.

It is contended, however, that, at least this was merely a mechanical and not an inventive act, the detachable screw plunger pressed into the molten glass by an actuating lever in a single downward thrust to make the screw, and the rotary spindle to remove the plunger again, being taken bodily from the dismantled Hemingray machines, and, with a few adaptive changes, combined with the turntable and stop taken from the New England presses, the device of the patent being thereby produced without more. It must be confessed, without intending to recede from anything which has been said, that the putting together of the several parts so employed, which, with the results from each, as we have seen, were old, has the appearance of being mechanical rather than inventive in the best sense, which the way it is said to have occurred goes to confirm. The success achieved, also, to a certain extent, no doubt, results from the practice of the process rather than the immediate operation of the machine, which, if made possible, is not necessarily induced thereby. But with all that may be so said, and admitting that no high order of invention is displayed, having regard to the efforts of other inventors in the same field, of which there have been not a few both before and since, as well as the difficulties to be overcome and the success of the device, both in the number and quality of the insulators produced, which, to whatever to be attributed, as already stated, has been somewhat marked, we are inclined with the court below to give the inventor the benefit of the doubt, and to hold that sufficient inventive ingenuity is disclosed to sustain his claim. As the litigation over the Duffield machine shows, the place in the art which is monopolized is not large, it being apparently not difficult to differentiate and improve on the immediate construction to which the inventor is confined; and others have not in consequence been prevented to any great extent from exercising their inventive faculties to that end. It is to be borne in mind that the invention consists, not simply in selecting and assembling the different parts, but in adapting and coördinating them to the work to be performed as well, and that, as pointed out above, it is the adaptability of the machine to the demands of the process that is its chief inventive claim. All things considered, we are therefore of opinion

that enough originality is shown, and of a sufficiently inventive kind, to meet the requirements of the law with respect to the particular features involved, which the defendants have considered of such merit as to adopt without material change.

It is said, however, that the machine is a mere aggregation, the different parts which are brought together having no combined action, but simply operating in juxtaposition, each by itself as a complete and independent piece of mechanism, under the manual control of separate workmen. And this view is confirmed, as it is urged, by the way the claims are progressively built up, starting out with a certain number of elements and adding one at each step, even the stop or detent to lock the table, and the standard about which it turns, being utilized to that end. But whatever may be said of the attempt so made, of which more anon, the different parts in our judgment sufficiently coöperate to a common end to dispel any such idea. The test is whether there is a new unitary result, to the production of which the different elements coact (Bliss v. Reed, 106 Fed. 314, 45 C. C. A. 304; National Tube Co. v. Aiken [C. C. A.] 163 Fed. 264), which certainly is the case. The purpose of the mechanism which is brought together is to make glass insulators, and this it most successfully and expeditiously does, a completed article being produced at a single turn. No doubt there are different steps in the operation to which the different parts are successively addressed. But it is not necessary that the insulators shall be made at a single stroke, in which each of the parts shall be involved. That may be desirable, and through the genius of some one, if the nature of the material permits, may possibly be attained. But for the present, a machine which embodies and is adapted to carry out the process, as it is understood and supposedly has to be performed, in which there are distinct parts for the several steps, is not to be condemned as an aggregation on that account.

It is contended, however, that the merit of the invention, whatever it is, belongs to Jordan, and not to Kribs, if not to different parties at the works. But of this we are not convinced. Both were employed at the Brookfield factory, where it was produced. And Jordan, with others, may have had a hand in certain parts. But the main idea evidently was that of Kribs, and it is this, rather than the minor features attributable to others, that controls. Kribs, who was a machinist, as Jordan was not, admittedly constructed the first machine that was built, and the device was always known about the works as the "Kribs press." When it was first put together, Jordan, according to some of the witnesses, declared that it would not work, and himself admits that he did not appreciate its value at the start. It is also significant that when, at the instance of Pease, he concluded to claim the invention and apply for a patent, notwithstanding his supposed acquaintance with the machine, if he was the real inventor, he got Flohl, a draftsman at the factory, to make drawings for him secretly, a press being set up in a separate room where Flohl, with the connivance of Pease, was locked in by Jordan for that purpose. The fact is that, although the experiments, which were carried on

at the factory to try and evolve something by way of improvement on existing methods, out of which the present invention grew, were knowingly conducted in the interest, as they were at the expense, of Mr. Brookfield, the subsequent assignee of the patent, there was a conspiracy by Pease, the superintendent, and Jordan, his assistant, into which one or two others were drawn, to get advantage of the result, on the discovery of which they were discharged. Jordan, at the instance of Pease, a few days afterwards, made application for a patent, claiming the invention, but dropped it when it was thrown into interference with the application of Kribs, which was subsequently put in. Two years later, when he and Pease had organized a company to exploit the device, he tried to get the question reopened on the ground that he had been deceived by his attorney, which was shown to be false. Taken altogether, his testimony is not calculated to impress one with its truth; and the others called in the same behalf are not in much better plight. All of them were discharged employés, except Anthony Kribs, a brother of the inventor, whose ill will is equally marked; and against this we have the testimony of a number of apparently disinterested parties who worked at the factory, and were thus in a position to know, who one and all declare that the invention was not that of Jordan, but of Kribs. It was so decided in the interference proceedings, which, while not conclusive upon us, it is for the defendants to overcome (Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657), and this, as is shown by this review of the evidence, they have not done.

The patent is therefore valid, and to be sustained; not necessarily in all its parts, but to the extent that the real invention goes. There are 10 claims in all, of which 6 are relied on, as set forth below:

"1. An actuating rod provided with a detachable screw plunger, combined with a rotary spindle adapted to engage the screw plunger, and a movable mold adapted to travel from the actuating rod to the spindle, substantially as described.

"2. An actuating rod provided with a detachable screw plunger, combined with a rotary spindle adapted to engage the screw plunger, a mold, and a movable support for the mold, substantially as described.

"3. An actuating rod provided with a detachable screw plunger, combined with a rotary spindle adapted to engage the screw plunger, a mold, a movable support for the mold, and a lock for holding the support with the mold in operative position relatively to the actuating rod and spindle, substantially as described."

"6. An actuating rod provided with a detachable screw plunger, combined with a rotary spindle adapted to engage the screw plunger, and a movable mold adapted to travel from the actuating rod to the spindle, said actuating rod and spindle being independent of one another, substantially as described.

"7. An actuating rod provided with a detachable screw plunger, combined with a rotary spindle adapted to engage the screw plunger, a movable mold adapted to travel from the actuating rod to the spindle, and independent actuating levers for the rod and the spindle respectively, substantially as described.

"8. An actuating rod provided with a detachable screw plunger, combined with a rotary spindle adapted to engage the screw plunger, a mold, a movable support for the mold, and a standard for supporting the actuating rod and spindle and about which the support is movable, substantially as described."

Of these the first is the broadest, the elements being (1) an actuating rod, provided with (2) a detachable screw plunger, (3) a rotary

spindle, adapted to engage the plunger, and (4) a movable mold,. adapted to travel from the rod to the spindle. The second varies from this in calling for (4) a mold, otherwise undescribed, and (5) a movable support for the mold. The third differs from the second only in having a lock or detent to hold the rotary table in place relatively· to the rod and spindle; while the sixth and seventh differ from the first, the one in specifying that the actuating rod and the spindle shall be independent of each other, and the other that there shall be independent actuating levers for the rod and spindle respectively. No one of the distinguishing features which are so relied on, however, is of sufficient significance to be made the subject of a separate· claim. And the same is to be said also of the standard supporting the rod and spindle, about which the table turns as specified in the eighth claim—which in other respects follows the second—a standard being· necessarily implied in all, and resulting, if allowed, in a clear duplication of claims. The third, sixth, seventh, and eighth cannot, therefore, be sustained.

Neither, in our judgment, can the first. The difficulty with it is· that it is too broad. The invention, as stated by complainants' counsel in their brief, "consists in the combination of five elements, to wit,. an actuating rod, a detachable screw plunger, a rotary spindle adapted to engage the screw plunger, a movable mold, and a rotary table or its equivalent to support the mold and carry it in a fixed and predetermined path from the actuating rod to the spindle and back again from the spindle to the actuating rod." And this is repeated in substance at other places, claim 2 being also referred to as accurately· describing the combination named. This corresponds with our own· view. But of the elements so specified, the first claim has only four,. the rotary table or movable support being left out. Nor is this to be supplied from the description given to the movable support, as adapted to travel from the rod to the spindle. Granting that, under some· circumstances, "adapted to travel" might imply a structural arrangement by which the mold is to be moved back and forth mechanically, between the designated points, in a fixed and predetermined path, yet this is not all. There is also the means employed, which is of the essence of the invention, being necessary to differentiate it from the prior art, and entering directly into the result. It is not alone, in· other words, that the molds go back and forth, but that they do so in a specific way. A movable support of some kind is thus required,. short of which the invention is not found, and this the first claim does not have. Moreover, if, disregarding this, this element is read into the claim, it is not distinguishable from the second claim, which it thus duplicates and destroys. Whichever way, therefore, it is regarded, it is invalid and cannot be sustained.

Not so, however, the second claim, which still remains. This, for the reasons given in this discussion, accurately represents the invention, within the narrow limits to which it is necessarily confined, and is good. There may be other features, not found in it, such as the measure or filling vessel, the shell, and the detent, which make for· greater convenience or efficiency; but the mold, the detachable plung-

er, the actuating rod, the rotary spindle, and the movable support,. all of which coördinated together, constitute the working machine, and no one of which can be left out, are here, and establish the validity of the claim. And, so far as the decree of the court below is based upon this part of the patent, it is correct, and is to be affirmed.

In the account which was directed, the complainants were awarded the entire profits derived by the defendants from the sale of insulators made on infringing machines. Exception is taken to this, that the patent is not for the product, but for the machine alone, and that all that the complainants are entitled to in consequence is what was saved to the defendants over the use of other machines. The answer to this is, that they could not have made anything by the old way. The Kribs press superseded all others, and went at once into general use, both by reason of increased output as well as better work. Insulators made according to previous methods were practically unsalable, costing too much and not coming up to the mark. No doubt the saving or advantage to the defendants is the true measure. Cawood Patent, 94 U. S. 695, 24 L. Ed. 238. But this may well be taken as represented by the difference between profitable and unprofitable commercial manufacture. More accurately, it would be the difference between the cost of insulators as made by the machine of the patent and the cost as made by those open to the defendants, which it displaced. But for all practical purposes, the two under the evidence are the same. If salable articles, in other words, could not be made at the ruling prices, by the old methods, without a loss, while with the machine of the patent there would be a profit, the profit so made has certainly been saved or gained from the invention. The saving might be more than this. dependent on the extent of the loss with other machines. It is clear that it would not be less. But the reckoning, as it is to be observed, is not up, but down. That is to say, we start with the price at which marketable insulators could not be profitably made on the old machines, and fall to their cost by the new, and the difference represents the saving or gain between the two. It does not matter, in this estimate, how the price which is so taken for the test happens to have been brought about, whether by natural agencies or not. It is the point where selling price and cost of production are the same, so that there is no profit in manufacture, that is the guide; by the price, meaning that which prevails in the market, which eliminates the cause of it, whether from one thing or another. And it is to this price that we must assume that the witnesses speak when they say that salable insulators could not be produced without loss on old-style machines.

It is said, however, that the so-called Kribs press, on which the estimate of profits is based, had other features, including some taken from the second Kribs patent, on none of which the defendants infringe. But the devices which are so referred to, which, no doubt, contribute to the general efficiency of the machine, are incidental rather than essential, and it is the latter that count. So far as the other Kribs patent is concerned, the parts are a little more highly organized; that is all. Considerable stress is laid, however,

on the importance of the filling piece, which has a great deal to do, as it is said, with the usefulness of the machine. But the filling piece plays no part in molding "pony" insulators, so called, which, as we understand it, constitute by far the bulk of those made; besides which —and this applies to all the features which the defendants do not infringe—if not used by them, they have not contributed to and do not enter into the profits derived by them from those which they did use; and it is with these profits alone that we are at present concerned. Further than this, the infringement in this case was deliberate, with every means taken to avoid being responsible for it, and, if there are any uncertainties in the situation, it is for the defendants, and not the complainants, to clear them up. Rose v. Hirsh, 94 Fed. 177, 36 C. C. A. 132, 51 L. R. A. 801; Regina Music Box Co. v. Otto (C. C.) 114 Fed. 508.

In the spring of 1903, the defendants secured the right to use a Duffield machine, from which time on no profits are claimed. In this machine the screw plunger is permanently attached to the rotary spindle, and so is not detachable as specified in the patent, on which, in consequence, it was held not to infringe. Brookfield v. Elmer Glass Works, 154 Fed. 197, 83 C. C. A. 180. It is contended, on the strength of this, that the Duffield being a successful machine, and the invention in suit being only distinguishable from it by the detachability of the plunger, the profits which are recoverable here are to be confined to the saving from this one feature, and cannot extend to the whole device. But this overrefines, as well as confuses, the case. The infringement was of the invention as a whole. The defendants got the benefit, not of one feature, but of all, and the saving thereby effected cannot be divided around. It is not as though they were being charged for infringing *sales* of the machine, where the profits recoverable would properly be confined to those realized from the features which constituted the patentable advance on the prior art. Force v. Swoyer Boss Mfg. Co., 143 Fed. 894, 75 C. C. A. 102. The infringement here is in the *use* of the patented machine, and response must be made in consequence for the saving effected, not from any particular part, but from the whole. It is said that this makes the defendants pay $29,910.48 for the difference between a detachable plunger and one where the spindle is attached, and, contrasting what they have now in the Duffield machine with what there was then, this may be the case. But infringement is to be judged by the state of the art when it takes place, and not by something like the Duffield, which has come in since. It is not, therefore, to be stated in terms of that device, as this is. Had the defendants had the Duffield machine, with its spindle attachment, they would not, of course, have had to resort to the Kribs, as they did, and would thus have saved what they are now called upon to meet. But this does not make them any less liable therefor. Nor can it be said that $29,910.48 is the price they pay for the slight difference between the two. That is the cost to them of the infringement. That is all. And, if it comes high, the time to think of that was at the start.

But it is further said that the profits with which the defendants are charged were largely brought about by an illegal combination in

restraint of trade, negotiated by Mr. Brookfield in violation of the Sherman anti-trust act, by which the only three manufacturers of glass insulators in the United States—the Brookfield Glass Company, of Brooklyn, N. Y., the Hemingray Glass Company, of Munice, Ind., and the defendants, represented by C. S. Knowles, a jobber of Boston, Mass., who controlled their output—were brought together in an agreement to maintain prices. The agreement referred to was made in April, 1901, and continued in force until about October 1, 1902, when it was abrogated at the instance of Mr. Brookfield, because it was not being lived up to by the defendants, as claimed. By it the different manufacturers named were to limit their production, and to sell according to an established schedule of prices, with preferences to certain favored customers. Two points are made with respect to this: (1) That, being prohibited by law, as a combination in restraint of trade, a court of equity will not do anything, directly or indirectly, to aid either party to recover the fruits of it; and (2) that, being only answerable for mechanical advantages derived from the invention in the manufacture of insulators, the defendants cannot be held for profits on sales which are the result of prices artificially stimulated by purely commercial activities. But neither of these contentions is sound. This is not a suit to recover the fruits of the agreement, but to charge the defendants with their wrongdoing without reference to that. It is true that they may have realized more because of the agreement, but that does not draw it directly or indirectly into the relief sought. The complainants do not have to set it up or rely upon it, which is the test. And, on the contrary, it is the defendants who seek to make use of its illegality as a shield behind which to escape. The law under such circumstances leaves the parties to an illegal contract as they are found. St. Louis R. R. v. Terre Haute R. R., 145 U. S. 393, 12 Sup. Ct. 953, 36 L. Ed. 748. It will not aid the one to get off, any more than the other to get on, by means of it. Its sole concern, if the contract is unexecuted, is that it shall do nothing to carry it out. And where it has been executed, as here, that is the end. Neither can the complainants be made responsible for the agreement, whatever its character, or whatever stage of it has been reached. It is true that Mr. Brookfield, their testator, representing the company of which he was the head, assisted in negotiating it and bringing it about. But the party who got the direct benefit from it was not Mr. Brookfield, but the Brookfield Glass Works, and, unless the distinction between corporate and individual interests is set aside, they are not to be confused here. Nor, aside from this, does it matter that by the concerted action of the several manufacturers of insulators, including the defendants, prices were put up to a figure beyond what they otherwise would have been, contrary to law. As already pointed out, the question is the profit or advantage, in matter of fact, which the defendants got out of the infringement, and this depends on whether or not they could manufacture without loss by the old methods at market prices, not how those prices came about, whether naturally or artificially, or what under other conditions they might have been. And for this comparison the prices established by the combination of manufacturers com-

plained of may properly be taken, the defendants, according to the evidence, being reasonably prosperous when they were maintained, but being put out of business, although having the help of their infringing machines, when the agreement was abrogated and prices went down.

Finding, therefore, no material error in the record, the decree is affirmed.