23 C.C.P.A.(Patents)

## DAVIS v. CARRIER. *

### Patent Appeal No. 3557.

Court of Customs and Patent Appeals.
Feb. 3, 1936.

*Rehearing denied March 23, 1936.

Robert T. Palmer, of New York City (Edmund H. Parry, Jr., of Washington, D. C., of counsel), for appellant.

Herman Seid, of New York City (Charles J. Staples, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

Appellant has here appealed from the decision of the Board of Appeals of the United States Patent Office, which affirmed the decision of the Examiner of Interferences in awarding priority of invention to the junior party, Carrier, in two counts of an interference, which counts were taken from the Davis application and are as follows:

"1. The method of conditioning the air in a passenger vehicle, which consists in drawing the air into a unit, passing the air through a cold water spray in said unit to remove all foreign matter therefrom, and reducing the temperature of the air, regulating its moisture content, and eliminating the entrained water from the air, all of which is accomplished in said unit, and then distributing the conditioned air into the space occupied by passengers in said vehicle, removing the heat units from said spray water, and returning said cooled water to said spray, then dissipating these heat units in a cooling tower.

"2. The method of conditioning the air in a passenger vehicle, which consists in

drawing the air into a unit, passing the air through a cold water spray in said unit to remove all foreign matter therefrom, and reducing the temperature of the air, regulating its moisture content, all of which is accomplished in said unit, and then distributing the conditioned air at a plurality of points into the space occupied by passengers in the said vehicle, and then cooling the said water for reuse and returning it to the spray."

As will be observed from the counts, the issue relates to a method of conditioning the air in passenger vehicles by passing the air through a cooled water spray in a unit to remove foreign matter therefrom, lower the temperature of the air, regulate its moisture content, and eliminate the entrained water from the air. After the air is conditioned, it is distributed through ducts into the spaces occupied by the passengers in the vehicle. Refrigerating apparatus removes the heat from the spray water which is returned to the spray unit. Count 1 calls for a cooling tower for cooling the spray water, and count 2 omits reference to any specific means for cooling the water. Since appellant stresses the importance of his being the first to suggest the installation of all the apparatus here involved in one passenger vehicle in which the air is to be conditioned, it is important to note that neither of the counts calls for any definite location of the apparatus involved in the method.

The party Davis is "Chief Engineer, Electric Traction, Baltimore & Ohio Railroad," and the party Carrier is chairman of the board of the Carrier Engineering Corporation, which with its subsidiary and connected companies is engaged in manufacturing, installing, and designing air conditioning equipment and systems.

There is much testimony in the record concerning early conversations between the parties in which apparatus for use in conditioning air in passenger vehicles was discussed. In view of our conclusion, it will not be necessary to consider all the testimony of the voluminous record. The facts which we regard as pertinent to our decision of the issues involved follow:

Prior to any contact being made between Davis and Carrier, the Baltimore & Ohio Railroad Company assigned to their chief engineer of electric traction, Davis, the duty of selecting air conditioning equipment and installing the same on its cars. Davis knew of certain refrigerating and air conditioning machinery which the Carrier Corporation manufactured, and also had in mind certain apparatus manufactured by the Frigidaire Corporation and others. From the beginning of the transactions between Davis and Carrier, it seemed to be the purpose of Davis to put the Carrier spray dehumidifier unit, together with some kind of refrigerating unit, on each individual car which was to be air conditioned. In view of the fact that there was danger of the ammonia from the compressors escaping into the passenger vehicle if so installed, Carrier at first did not readily agree to this system of installation and advocated putting the refrigerating machine in the baggage car or at least outside of the air conditioned car. Davis, however, was insistent that some kind of satisfactory air conditioning system involving the water spray method be installed on the car which was to be used for experimentation. The record is full of correspondence and conversations between Carrier and Davis relating to the installation of an air conditioning system. "B. and O. car No. 5275" had been chosen as the vehicle upon which experiments were to be made. Carrier, after some correspondence, succeeded in getting Davis to send him blueprints showing the available spaces in said car in which the apparatus might be installed. Carrier then drew, or caused to be drawn, complete plans for the installation of the units in the car, and with Davis' permission, and at the request of the railroad officials, proceeded to install the units in the car in accordance with said plans. In this task he was aided by H. Richard Arf, his assistant, a graduate engineer. Arf worked under Carrier's directions, and stayed on the job until it was finished. He then tested it on the standing car, as well as on the car while running, and found that it performed its intended functions satisfactorily. John D. Winters did some work in connection with the installation of the system. He was general foreman, electrical department, of the Mt. Clare shops of the Baltimore & Ohio Railroad Company.

At the hearing here it was stated that this invention had not gone into commercial practice. It was suggested that the use of the water spray method had not

met with the commercial success which had been anticipated for it, and that. possibly there were other objections to the system which rendered it commercially impracticable at this time. It is clearly shown in the record, however, that the system installed performed satisfactorily the function of cooling, dehumidifying, purifying, and distributing the air.

While there is certain documentary evidence in the record, introduced by Davis, which is, to some extent, relied upon by Davis as having a bearing upon the question of priority herein being considered, none of the same, we think, supports appellant's contentions or in any way affects our conclusion.

It is Davis' chief contention here that since he was the first to insist upon the particular kind of construction which is involved in the conditioning of the air of said car No. 5275, and that it was by virtue of his insistence that Carrier finally consented to the installation, he should be regarded as the first inventor, having first conceived the invention, and that Carrier's and Arf's work was merely that of skilled mechanics carrying out the details of the plan which he (Davis) had devised. This contention, he maintains, rests upon the familiar principle announced in numerous decisions, not necessary to discuss here, to the effect that where an inventor conceives an invention and lays out and describes to another the plan of the same and directs how it shall be constructed, he is entitled to the benefit of the work of the one who carries out and puts into operation such a plan. This principle is involved in the following authorities: Fritz v. Hawn, 37 F.(2d) 430, 17 C.C. P.A.(Patents) 796; Braunstein v. Holmes, 30 App.D.C. 328; Novelty Glass Mfg. Co. v. Brookfield et al. (C.C.A.) 170 F. 946.

The second contention of the appellant is that the record shows that the relation of employer and employee existed; that Carrier and Arf were his employees, or possibly his contention may amount to a claim that Carrier and Arf were the employees of Davis' employer, the Baltimore & Ohio Railroad Company. It is stated by appellee, and not disputed by appellant, that the B. F. Sturtevant Company, an active competitor of the Carrier Engineering Corporation, in manufacturing air conditioning devices, 'is the owner of the Davis application and the real party in interest. Just what re-

lations exist between said Sturtevant Company and the Baltimore & Ohio Railroad Company is not disclosed.

■ The Examiner of Interferences held that the facts of record did not show that Davis was the inventor; that certain evidence "appears to show that the working out of the problem of air conditioning in every detail was put up to the Carrier organization and contains no indication of any prior idea on the part of Davis as to the specific methods required by the counts"; and that "Davis at the most went no further than to suggest results without suggesting methods or means. The presumption is in favor of Carrier as the skilled inventor in the air conditioning art. Lawner v. Katzman [20 C.C.P.A.(Patents) 924] 17 Pat.App. [Pat.Quar.] 223, 64 F.(2d) 128; 423 O.G. 4." The Examiner of Interferences further held that Davis derived the invention from Carrier.

The Board of Appeals, although employing somewhat different language, affirmed the decision of the Examiner of Interferences, and based its affirmance upon substantially the same reasons as those assigned by him. The board explains Carrier's reluctance in making the installation suggested by Davis as follows:

"* * * Carrier explains that he urged this for the reason that he felt a satisfactory refrigerating unit could not be found for the purpose as if the apparatus was installed in individual cars it would have to occupy a comparatively small space and a refrigerating unit which would be large enough to do the work satisfactorily and yet small enough to occupy little room in a passenger coach was not available on the market. There was some talk of using an evaporative system to cool the spray water but this was not thought feasible. Mr. Carrier offered to loan Mr. Davis two of the Carrier spray units and let him experiment with these units and also offered to send an engineer to aid in installation of the plant.

"Mr. Davis was not discouraged by Mr. Carrier's attitude but corresponded with a number of companies having to do with air conditioning and refrigeration to get what information he could in this connection. Finally Mr. Davis was authorized by the management of the Baltimore & Ohio Railroad to make tests of an air conditioning equipment in a Baltimore & Ohio coach and he then

sought and obtained the loan of various parts of an equipment for this purpose and finally notified Mr. Carrier that the Frigidaire Company had promised to loan certain refrigerating equipment for this test in connection with the two Carrier spray units promised by Mr. Carrier. Then Mr. Carrier expressed a desire to cooperate with Mr. Davis in equipping the Baltimore & Ohio coach with the air conditioning system including a spray cooler and refrigerating equipment and Mr. Carrier asked that the equipment be borrowed through him. Mr. Carrier then obtained refrigeration equipment from the Brunswick-Kraeschell Company and also suitable motors for operating the apparatus from the General Electric Company.

"Davis makes a great point of the fact that Carrier did not seem particularly interested in the projected tests until he, Davis, had practically obtained permission to use a Baltimore & Ohio coach and had obtained the loan of suitable equipment to be placed in the coach for the test. Carrier evidently had no special urge to carry out these experiments with his knowledge of the equipment suitable on the market at that time but perhaps this is explained by the fact that this refrigerating equipment used as refrigerants certain chemicals which in case of an accident to the train would be dangerous to the occupants of the coach as well as the fact that the refrigerating equipment on the market was not of proper capacity or if of proper capacity not of proper size to be conveniently positioned in a passenger coach. It is true that the equipment from the Brunswick-Kraeschell Company which was finally used was perhaps known to Mr. Carrier at this time and made use of a refrigerant which had the characteristics thought to be undesirable by Mr. Carrier but evidently Carrier knew of none better on the market and as the tests were to take place used what he considered best.

The board then points out that the counts involved do not necessarily call for the positioning of all the units of the system in a passenger vehicle and that the positioning of some of the apparatus in a baggage car, which Carrier was urging, would satisfy the counts.

■ We agree with the conclusion reached by the board that Carrier was the first and original inventor of the subject-matter of the counts, and that Davis at most only suggested the desirability of having a car air conditioned by apparatus involving units all of which were to be installed on a single car. Davis was not skilled in this art. The testimony shows very clearly that he had no comprehension of the ultimate effect or practicable commercial value of the proposed combination of the various units employed, or certain dangers incident thereto. He did not suggest to Carrier any such plan as is involved in either of the cited cases relied upon by Davis.

It is our view that more than mere mechanical skill was required to produce an air conditioned vehicle, such as Davis hoped for, and we agree with the board that the Carrier Engineering Corporation, through Arf, directed and performed that which neither Davis nor Winters "were equal to supplying."

The Carrier Engineering Corporation spent about $5,000 in making the installation, none of which was repaid by Davis or his company. It is true that Davis or the Baltimore & Ohio Railroad Company furnished certain materials and expended some money, small in comparison to that spent by Carrier, in connection with the enterprise, and that Winters helped in the installation of the system.

■ We agree with the tribunals below that there was no relation of employer and employee, such as would entitle Davis to the benefit of the work of Carrier and Arf, shown in the record at bar. Carrier and Arf did not work under Davis' directions nor did they receive compensation from him. They were both privileged to do the work called for by the plans, furnished by Carrier, without regard to any orders or supervision on the part of Davis. Neither do we think that Carrier and Arf were the employees of the Baltimore & Ohio Railroad Company so as to bar Carrier being held the inventor of the system produced. There is nothing in the record that would indicate that the Baltimore & Ohio Railroad Company regarded Carrier and Arf as its employees. It paid them nothing and it did not direct the manner in which they performed the task undertaken.

We have carefully read and considered the voluminous record and briefs, and, in view of our conclusion that the board arrived at the correct result for the rea-

sons which it assigns, no useful purpose could be served in discussing here all the different phases of the case discussed by the parties and the tribunals below.

After the original transcript of record had been certified from the Patent Office, appellee suggested a diminution thereof, and this court issued a writ of certiorari requiring that certain additions to the record be certified by the Commissioner of Patents and that the same be printed. In pursuance to said writ, said additions were made to the record. It is our view that the additional record so certified and printed was unnecessary to a proper determination of the issues in this case, and that the cost of printing the same should be taxed against the appellee, and it is so ordered.

The decision of the Board of Appeals is affirmed.

Affirmed.