NESTLE PATENT HOLDING CO. v. E. FREDERICS, Inc.

(Circuit Court of Appeals, Second Circuit. June 10, 1919.)

No. 189.

1. PATENTS ⬡7, 119—INVENTIONS FOR PROCESS AND APPARATUS MAY BE EMBRACED IN ONE PATENT.

A process and an apparatus by which it is to be performed are distinct matters, and, while they may be embraced in a single patent, may be the subject of different patents.

2. PATENTS ⬡328—PROCESS AND APPARATUS FOR WAVING HAIR VALID AND INFRINGED.

The Nessler patents, No. 1,052,166 and No. 1,052,167, for apparatus and process for waving hair, conceding their validity, held not infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Nestle Patent Holding Company against E. Frederics, Incorporated. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 258 Fed. 627.

---

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This cause comes here on appeal from a decree entered in the United States District Court for the Southern District of New York on July 15, 1918. A bill of complaint was filed by Charles Nessler against the defendant, a corporation organized and existing under the laws of the state of New York. The plaintiff therein alleged that he was the first, original, and sole inventor of certain improvements in apparatus for waving natural hair on the head, and that the government of the United States had issued him letters patent No. 1,052,166, on February 4, 1913, for his invention of an apparatus for waving natural hair on the head. While the patent did not issue until 1913, the application was filed ₁on August 6, 1909. The plaintiff therein also alleged that the government of the United States issued to him on February 4, 1913, letters patent No. 1,052,167, for a process of waving natural hair on the head. The plaintiff further alleged that George Aldworth, on March 18, 1915, duly filed in the United States Patent Office an application for letters patent for certain improvements in permanent hair-waving appliances, and that the said Aldworth had assigned his rights therein to plaintiff, which assignment had been recorded in the United States Patent Office, and that letters patent No. 1,186,533 had been issued on said application to the plaintiff. The plaintiff, Nessler, claimed in the bill that defendant had infringed these several patents and prayed for an injunction restraining defendant from infringing, and for costs, profits, and damages. The defendant moved to dismiss, on the ground that plaintiff at the time of the motion was an alien enemy, being a subject of the emperor of Germany. This motion was denied on June 25, 1917, and a motion to mark the cause reserved generally was granted.

On July 13, 1917, Charles Nessler assigned to the Nestle Patent Holding Company, Incorporated, all his right, title, and interest in the three letters patent involved in the cause, together with all rights to sue and recover all damages for past infringements of the patents. On July 20, 1917, the Nestle Patent Holding Company, Incorporated, presented a petition to the court, in which it stated that it had acquired all the right, title, and interest of the original complainant, Charles Nessler, and asked permission to file a bill in the nature of a supplemental bill. On November 16, 1917, an order was obtained allowing plaintiff to file a bill in the nature of a supplemental bill, substituting the Nestle Patent Holding Company, Incorporated, for Charles Nessler as plaintiff herein. The Nestle Patent Holding Company, Incorporated, is a corporation organized under the laws of the state of New York, and having its principal office in the city of Hornell, county of Steuben, state of New York. The supplemental bill asked for all measures of relief as prayed in the original bill, and that the present plaintiff might have the full benefit of all the proceedings previously had and the orders which had been entered in the cause.

On November 23, 1917, the cause was restored to the general calendar. The Trading with the Enemy Act approved October 6, 1917 (40 Stat. 411, c. 106 [Comp. St. 1918, §§ 3115½a–3115½j), by paragraph (G) under section 10, authorizes any enemy or ally of an enemy to prosecute suits in equity against any person other than a licensee to enjoin infringement of letters patent in the same manner and to the extent that he would be entitled to do if the United States was not at war, subject, however, to a proviso which it is not necessary now to consider.

Charles Neave and Willis Fowler, both of New York City, for appellant.

Charles H. Wilson, of New York City (Thomas Ewing, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The patents in suit relate to alleged improvements either in the apparatus or in the processes for producing a so-called "permanent" wave in the hair while on the human head. Prior to the patents in suit hair had

been waved, both when on the human head and after it had been removed from the head and made up into "switches" and sold as "commercial" hair. A large business has been developed under the patents in suit.

The president of the plaintiff company, Charles Nessler, was born in Germany and began the business of a hair dresser in Zurich and Geneva in Switzerland. Then he removed first to Paris, and afterwards to London, where he maintained an establishment for several years, and was employing some 23 persons just prior to the breaking out of the war. In 1915 he removed to New York City, where he has since carried on his business. The president of defendant company, Ernest O. Frederics, was also born in Germany, where he learned his trade. He, too, removed to London, where he pursued his occupation as a maker of wigs and hair dresser. He also removed to New York City in 1914, where he established himself, and he describes his occupation as that of "permanent" hair waving, and states that he first started to wave hair upon the head in 1916.

The patents in suit are three. Patent 1,052,166, being the apparatus patent granted Nessler, contains six claims and the complaint alleged that the defendant infringed particularly claims 3, 4, 5, and 6. The court below held claim 5 void. That claim we do not need to consider, as on the argument in this court it was withdrawn by the appellant from consideration on this appeal.

Claim 3 reads as follows:

"3. In apparatus for waving hair, the combination of a curler, a tubular heater, a tube closed at one end for receiving said curler with the hair thereon, and adapted to be inserted in said heater with the closed end outermost; the said heater being provided at its outer end with a vent for the gases issuing from the inner end of said curler receiving tube, substantially as described."

Claim 4 reads as follows:

"4. In apparatus for waving hair, the combination of a curler, an absorbent material for enveloping the curler with the hair thereon, a tube closed at one end and adapted to receive the curler with the hair and absorbent material and cover the same, and a heater within which said tube with its contents may be inserted."

Claim 6 reads as follows:

"6. In apparatus for waving hair, the combination of a curler, a tubular heater, a tube closed at one end for receiving said curler with the hair thereon and adapted to be inserted in said heater with the closed end outermost, means for loosely binding the open end of said tube about the hair; the said heater being provided at its outer end with a vent for the gases issuing from the inner end of said curler receiving tube, substantially as described."

The court held none of the above claims infringed.

Patent No. 1,052,167, being the process patent, contains three claims, all of which the court held not infringed. Claim 1 reads as follows:

"1. The herein described process of waving hair, which consists in coiling the hair, then covering it with absorbent material suitably moistened, then applying a suitable liquid or lotion and heat, and causing the gases or vapors liberated by the heat from said liquid or lotion to act on the hair through the absorbent material, substantially as and for the purpose set forth."

Claim 2 reads as follows:

"2. The herein described process of waving hair, which consists in coiling the hair, then covering it with absorbent material, then applying a suitable liquid or lotion and heat, and causing the gases or vapors liberated by the heat from the said liquid or lotion to act on the hair through the absorbent material, substantially as and for the purpose set forth."

Claim 3 reads as follows:

"3. The herein described process of waving hair which consists in coiling the hair, then covering it with absorbent material suitably moistened and inclosing the same in a closed vessel or tube containing a lotion, and applying heat to the vessel and vaporizing the lotion, and causing the vapors or gases to act on the hair through the absorbent material while said vapors or gases are confined, substantially as and for the purpose described."

The court also held that the above claims were not infringed.

Patent No. 1,186,533, being the Aldworth patent, contains eight claims. The complaint put in issue claims 1, 2, 3, 4, 5, 6, and 7 thereof, and the court held this to be a good and valid patent as to claims 1 to 7, inclusive, and that defendant had infringed each of claims 1 to 7, inclusive. As the defendant has not appealed, it is not necessary to consider these claims, and no reference to them is hereinafter made.

The plaintiff in its appeal insists that the court erred in dismissing the bill as to patent No. 1,052,166, the apparatus patent, and as to patent No. 1,052,167, the process patent, on the ground of no infringement.

[1] A process and an apparatus by which it is performed are distinct matters. They may be found in one patent, or they may be the subject of different patents. Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034; Leeds & Catlin v. Victor Talking Machine Co., 213 U. S. 301, 29 Sup. Ct. 495, 53 L. Ed. 805. In Steinmetz v. Allen, 192 U. S. 543, 24 Sup. Ct. 416, 48 L. Ed. 555 (1904), the court held that rule 41 of practice in the Patent Office, in so far as it required a division between claims for a process and claims for an apparatus, if they are related and dependent inventions, was invalid.

[2] In his original application for a patent Nessler did not separate his apparatus invention and his process invention, and on October 19, 1909, the examiner in the Patent Office wrote him, calling attention to the fact that the inventions were separate and independent, and that "division is required between the two sets of claims above mentioned before action on the merits of the case can be given." This was after the decision in the Steinmetz Case. The reason for this action in the Patent Office in asking for the separation of the claims was that the claims for the process and those for the apparatus were not regarded as "related and dependent inventions." It is evident that the process patent might be infringed without using the specific apparatus disclosed in the apparatus patent.

In Cochrane v. Deener, 94 U. S. 780, 788 (24 L. Ed. 139), the court, speaking through Mr. Justice Bradley, said:

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing. If new and useful,

it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable, whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

The patents in suit relate only to the waving of hair while on the head, which is a special problem quite distinct and apart from the problem of waving hair which has been severed from the head and which is known as "commercial" hair. The testimony shows that at the time these patents were taken out it was known that commercial hair could be so treated as to produce a wave having a considerable degree of permanence. The process used in the case of commercial hair consisted in moistening the hair, winding it tightly around a curling stick, winding strips of paper around the hair and strips of cotton cloth over the paper. Then the hair on the stick thus covered was put in a vessel containing water and borax in solution and boiled from 2 to 8 hours. It was then placed in a drying oven to steam for 3 to 6 hours (according to one patent for 12 to 48 hours). The hair then was unwound from the curling stick and combed. The wave thus produced in the hair is said by some, but not by all, to be a "permanent" wave.

But, whether permanent or not, it seems to be conceded that hair so treated retained its wave for years in spite of repeated washings. This result was due, not merely to the use of liquids, or heat, or pressure, but to the subjection of the hair, while tightly wound, to the action of steam. Chemicals were not always used in this steaming operation.

The above process is inapplicable to hair on the head. Hair, of course, cannot be boiled when on the head; neither can it be kept in a drying and steaming room for a long period of hours while on the head. The most common process used some 25 years ago for curling hair on the head was to take a strand of the hair, moisten it, and wind it around a metal tube some three or four inches in length, and then insert a heated rod in the metal tube, so that the heat could be transmitted through the metal tube to the moistened hair outside of it. There is some testimony in the record that sometimes a piece of wet cloth was wound around the curler before the strand of hair was wound on; but there is evidence at least that this was not done with what was known as the "Cleveland" or "Columbia" curler.

It appears that permanence of wave depends upon the use of steam, and that heat alone does not accomplish it; and the prior art left unsolved the problem of steaming the hair while on the head, so as to obtain a permanent wave, and the Nessler patents, including the Aldworth patent, all relate to waving natural hair on the head. In his specifications of letters patent No. 1,052,166, the apparatus patent, Nessler says nothing about a permanent wave; in his specification of letters patent No. 1,052,167, the process patent, in describing his improved process in a passage hereinafter quoted in this opinion, Nessler says that waves produced according to his process "are practically permanent"; and in the specification of letters patent No. 1,186,533 Aldworth asserts that he has invented "a new or improved permanent

hair-waving appliance," but in no one of the claims in this patent does Aldworth use the word "permanent." That word is absent from the "claims" of all three of the patents in suit. The use of the word "permanent," whether in connection with the waving of hair on the head or off the head, is more or less misleading. The extent of permanency in a wave depends upon the amount of steaming and heating the hair has been subjected to, and also upon the quality or texture of the hair itself—in fine hair the "permanency" of the wave does not last as long as where the hair is of a coarser texture.

When Nessler applied in 1909 for his process patent, he described in his specification the then known process as follows:

"A known process for waving hair consists in tying a curler of the ordinary kind (for example, a thin metal tube, which may be about 3½ inches long) to a portion of the hair about as thick as the curler, coiling the hair around the curler, applying suitable lotion, then covering with a tube (of compressed paper, asbestos, or other suitable material) closed at one end, and applying a heating iron outside the tube."

Nessler, when on the stand, was asked how long he had known that process, and his reply was, "since October, 1905," when he stated it in an address before a body of hair dressers and medical men in London. Then the following colloquy took place:

"Q. What was the result of the use of this thing which you have described here as the known process; how satisfactory was it? A. The known process produced practically the same results as the present one, but it was extremely slow and unsafe.

"Q. When you say 'extremely slow,' how long did that old process take? A. Seven or eight hours for a head of hair.

"Q. And how much quicker is your present process? A. Considerable, because the present process heats a whole head of hair in eleven minutes altogether, and with the old process the heaters had to be held by hand, one after the other, and the heating consequently would take from three to four hours."

In the specification for his process patent, No. 1,052,167, Nessler states his improved process as follows:

"In my improved process I coil the hair around the curler as in the practice above referred to, but I do not apply the lotion directly to the hair. I wrap a strip of flannel or other similar absorbing material moistened with water helically over the hair on the curler, so as to completely cover the said hair. I then pour a suitable lotion into the tube and allow it to collect in the closed end thereof, and I then place the tube over the hair on the curler, so as to cover the same, and apply the heating iron. I find that by thus keeping the lotion from direct contact with the hair, and only allowing the gases or vapors liberated by the heat to act on the hair through the moistened flannel, great advantages are obtained. The waves so produced are practically permanent and appear quite natural; whereas hair waved by ordinary processes is rendered straight again by moisture in the atmosphere or by washing. Hair waved by my process, though it may possibly become straight, if allowed to get dirty or greasy, will resume its waved condition on being washed. After the tube has been placed over the hair, the open end may, if desired, be closed down on the hair by tying with string or otherwise, so as to prevent too ready escape of the vapors. It will be understood that I may use any convenient known form of heater, electric or other; but I prefer to employ an electric heater as specified in the specification accompanying my application filed on 6th August, 1909, serial number 511,562."

261 F.—50

Nessler claims that prior to his process the effect obtained as to hair on the head was a temporary waving, and that the result of his process was the permanent wave. He says that hair heated according to the prior process came back into straight form immediately it was allowed to come in contact with humidity; that it would reasonably keep its shape, it might be for one day, two days, a week, perhaps, but no longer, and the moment any drop of water came on any particular piece the hair became straight. Nessler under his process guarantees a permanent wave, which he says lasts forever, less the new hair which grows. No one can shampoo the wave out of the hair treated by the Nessler process. This is contrary to the testimony of numerous witnesses, as already stated, that there is no such thing as a permanent wave. But if Nessler produces a permanent wave, Frederics does not produce a wave that is permanent; so that the result attained by Frederics is not the result attained by Nessler. Nessler says his result lasts forever; but Nessler's own witnesses prove that Frederics' "permanent" wave lasts only three months, and Nessler bases his claim on the allegation that his combination of the old elements produces a *new result*, which is a *permanent* wave, as distinguished from a *temporary* one, which was old. There is nothing in this record which shows that Frederics has ever produced a permanent wave. A wave that is "everlasting" and one that lasts for three months are hardly one and the same.

One of the most experienced witnesses defined a permanent wave as "a wave that can be wetted and which will retain its wavy effect." The witness was a member of a firm which had been in existence for 47 years, and he had been with it for 26 years. His firm is credited with being the largest wholesale hair dealers in the world, and it had 3,000 accounts in the United States. This witness testified in very positive terms that permanent waves were produced in hair on the head prior to Nessler, and by the use of the old Cleveland hair waver device. This is an excerpt from his testimony:

"Q. You have seen the use of the Cleveland waver on the hair to make a permanent wave? A. Positively.

"Q. Was it then called the everlasting wave? A. Yes; they referred to it as the everlasting wave."

And he testified that hair so waved retained its wave after it had been shampooed. In this he was substantiated by other witnesses. A manufacturer of toilet preparations, including a hair-curling fluid, was asked as to the Cleveland device, which was used 25 or 30 years ago:

"Q. Would the hair stand wetting after the use of this device, and still retain it? A. Yes; if the rod is heated sufficient, so as to help bake the wave in shape.

"Q. It will stand wetting? A. Yes."

The gist of the Nessler invention, as stated by his counsel at the argument, but not by Nessler in his specifications, is the provision made for obtaining more steam. It consists in having a reservoir of liquid, thus providing for more moisture than would be obtained by merely wetting the hair, and then heating this reservoir of liquid so as to produce steam, and then so confine the steam that it will be held in contact

with the hair. What Nessler hoped to get was more steam than he thought he could secure if he merely moistened the hair, and instead of applying the heat directly to the hair, as had previously been done, he applied the heat to a reservoir of liquid or lotion and produced vapor which he forced into the hair to heat and moisten it. Plaintiff's counsel say in their brief:

"The point is that considerable steam must be generated and be applied to the hair to effect the desired result, and this requires a reservoir of liquid to be converted into steam, and this reservoir is between the heater and the hair, so that there shall always be a wet heat applied to the hair, and not a dry heat, as is the case when the heater is next to the hair, as it was in the use of the Cleveland heater, in which, as soon as the moisture is driven out of the hairs next to the metal tube, those hairs are subjected to heat alone. The use of the Cleveland heater results in drying the hair; the use of the Nessler invention results in moistening the hair by driving steam into it."

As it appeared to the court below, and as it appears to this court, the crux of this litigation is to be found in this moisture and in the manner of applying it to the hair. If we concede that Nessler was, as is asserted, the first to treat coiled hair with vaporized lotion only, and that the lotion might mean solution of borax or just water, anything that steams, then the question is whether the borax pad used by Frederics is an infringement. The court below has found that it is not; that the vaporizing of a lotion, which is an essential part of Nessler's process, has never at any time been used by Frederics in his process of treatment. When Frederics first began to wave hair in this country, which was in 1916, he used a tube. He testified about this as follows:

"Q. Describe the tube which you used. A. There was blotting paper on the inside of the tube, and this holding borax paper, and an outer tube is ordinary papier-mâché, and this was put in water and of course it absorbed right away the water, and then I placed this over a curler and tightened it close to the scalp, and after it was tight I placed another shield here, and then placed a heater over it to steam it, and a certain amount of steam was kept in the tube, and a certain amount escaped.

"Q. Did you at that time use a tube closed at the outer end? A. No.

"Q. Have you ever used a tube which is absolutely closed at either end, A. No.

"Q. The one next to the hair is simply tied around the hair as tightly as you can get it? A. Yes.

"Q. Sometimes you tuck a little cotton in the end of one. A. Yes."

In this use of the tube he was notified by the plaintiff that he was infringing the Aldworth patent. He then consulted counsel, who advised him to discard it, which advice he followed, and ceased to use the tube in February, 1917. In the use of the tube, as the court below found, and as is now conceded, the defendant infringed the Aldworth patent. After discarding the tube, he adopted a steam pad, and his use of that was explained as follows:

"A. After the hair is wound on a curler, I place the solid cake of borax right up against the hair. I wet it, of course.

"Q. Describe how that is made. A. A solid piece of borax powder has been wet, and then in a cake form placed on a paper.

"Q. A cake of borax? A. And this is placed around in order that the powder should not fall out, just to carry this borax powder.

"Q. Why do you have the stitches there? A. So that the powder should not sift—fall out.

"Q. You have got the borax stitched into a rectangular pad? A. Yes.

"Q. What do you do with your rectangular pad when you are going to beautify the hair? A. I wet it first.

"Q. What do you do next? A. Then I put this tight around the hair.

"Q. Make a tube of it, and then wrap it in a tubular form around hair? A. I put it as tight as I possibly can around the hair.

"Q. And then what do you do? A. Then I place a paper tube over this and close it on the inside against the scalp, and the other side I leave open for the steam to escape.

"Q. And then what do you do next? A. And then I place a heater over, and put on the heat for about 14 to 17 minutes, and then the heat produces steam, and after this head has been heated for about 17 minutes I switch off the heat, and take the tube off, and shampoo the hair, and then there is a permanent wave."

He continued his testimony as follows:

"Q. Have you ever wrapped a flannel around the hair on the curler? A. In the beginning, before I had this steam pad, I used a flannel against the hair. I placed borax powder on each side of this flannel, and placed this around the curler.

"Q. So that borax came into intimate contact with the hair? A. Yes; that is my chief point, that I want to bring the borax right on the hair.

"Q. You want to get it as close to the hair as you can? A. As close as possible.

"Q. You said you never used a closed tube. Did you ever use any lotion which you poured into the tube? A. No; I do not use any lotions.

"Q. And you have never used any tube which you could pour a liquid into? A. No.

"Q. What did you use to wet the pad? A. Water.

"Q. You never used anything else except water? A. That is what I used; I dipped it in ordinary water.

"Q. In the use of your tubes, what becomes of the steam that is produced by the heating of the moistened tube—moistened pad? A. It escapes on the other side of the tube.

"Q. You do not want to keep the steam in there? A. I want to keep a certain amount, so that the pressure should escape, so that there is not too much suction on the head.

"Q. You keep it there until the hair is dry? A. Not exactly; sometimes it is, and sometimes it is not.

"Q. Does the element of personal skill have anything to do with the way you carry on your process? A. That is the principal thing really; the skill and the knowing of this operation is the principal thing. The apparatus cuts very little."

Nessler describes his process as consisting:

"In coiling the hair, then covering it with absorbent material suitably moistened and inclosing the same in a closed vessel or tube containing a lotion, and applying heat to the vessel and vaporizing the lotion and causing the vapors or gases to act on the hair through the absorbent material while said vapors or gases are confined, substantially as and for the purpose described."

But, while Nessler thus incloses the hair and absorbent material in a vessel or tube containing the lotion, the process of Frederics does not contemplate vaporizing a lotion in a closed vessel and causing the vapors to act on the hair through absorbent material while the vapors or gases are confined.

The process of Frederics in large degree comes within the terms of Nessler's disclaimer, heretofore quoted as the known process. The

"suitable *lotion*" referred to in that disclaimer is in Frederics' a borax *paste*, and the end of the tube, which in the disclaimer is closed at the end, is in Frederics' process left open, and so is not capable of holding a liquid. In leaving the end of the tube open Frederics differs from Nessler's claim in the process patent, in which he claims "a closed vessel or tube." Nessler uses a lotion, which he seeks to keep separate from the hair by covering the latter with an absorbent material. Frederics uses a paste, which he strives to get as close to the hair as possible, by eliminating the absorbent material and by using a pad sewed with a big needle to permit more ready escape of the borax paste. In the Nessler process the hair wrapped in some absorbent material is placed in a closed vessel or tube, into which a lotion is poured, and the gases liberated by the heat are caused to pass through the absorbent material. The difference between the Frederics and Nessler processes is plainly manifest.

The use of borax on the hair and the moistening of the hair with water and a cloth were old in the art, and Frederics unites them in a moistened pad, putting the borax inside the pad, and by this means he obtains perhaps five or six times the amount of water that could be applied directly to the hair. By using four plies of material in the pad, the water-holding capacity of the pad is increased; each ply increasing the water-holding capacity within itself, as well as by its juxtaposition to its neighbor by capillarity. The suggestion that this flat pad is converted into a tube, because it is wrapped as tightly as possible around the hair, is an argument we are unable to follow.

Frederics testified as follows:

"Q. Is there anything in your process you care about which is a matter of secrecy? A. No.

"Q. Will you let every one know just how you do it? A. Yes."

Nessler testified as follows:

"Q. I have given you an opportunity to state what you have done to that hair which makes it permanently wavy, if it is any different from what you were taught to do with commercial hair in Switzerland. Have you anything that your wish to say? A. About ten minutes ago I explained that this is done on a scientific basis, and the other by mere physical force and time.

"Q. The scientific basis is that you use the electric heater? A. No.

"Q. What else is there? A. I beg your pardon; I would rather not explain that in open court. It is a matter of commercial secrets, and here are people who know nothing about that, and whom I do not want to know.

"Q. Very well; I do not wish to inquire into your commercial secrets."

In Nessler's specification of his process patent, No. 1,052,167, already quoted, he states that he pours "a suitable lotion into the tube." The court below understood that Nessler meant by "a suitable lotion" something which by its ingredients assisted in curling. And the court in its opinion said:

"If this were not so, he would never have differentiated between the water which moistened his flannel and the lotion to be vaporized in his tube. Indeed, in his testimony he seems to me substantially to admit the use of a preparation regarded by him as sufficiently valuable in 'permanent curling' to be kept secret."

It is difficult for us to resist the conclusion that Nessler's process involves the use of some undisclosed lotion, which constitutes the "suitable" lotion, the use of which enables Nessler to obtain a wave which he says is "everlasting" and the want of which makes Fréderics' wave one of "about three months."

We are also satisfied that the Nessler apparatus patent, No. 1,052,- 166, is not infringed. The specification of this patent states that:

"My invention consists in part in providing an orifice 12 in the handle end of the heater for the purpose of allowing the steam and gases to escape when the heater is in use as illustrated in Fig. 1. The steam and gases pass out of the open end of the compressed paper or like tube which incloses the hair on the curler, and then pass between the outer surface of the tube and the inner surface of the heater until they reach the orifice 12. In some cases the steam and gases may pass through the material of the tube, or through the tied-up end 20. Such an orifice as 12 has not been provided in heaters of this kind hitherto, and the steam and gases having their only exit from the orifice next to the subject's head have been apt to cause burns on the scalp. Another feature of my heater is the tapered shape of the end 21. Heaters have hitherto been made with flat ends, and unless such heaters are held with the end quite flush with the head the hair will not be completely embraced by the heater."

In the prior art hair had been waved by winding it about a curler, applying a lotion, covering it with a closed tube of paper, asbestos, or the like, and applying that heater outside the tube. Heaters heretofore used in this process lacked vent 12 and did not have the tapered ends shown in the patent; but, as none of the claims of the apparatus patent sued on specifies the tapered end, we do not need to consider it. The vent 12 is, however, mentioned in claims 3 and 6. This vent appears to us to be useless. The vapors generated within the heater are supposed to escape through this vent 12 thereby saving the scalp from scalding. A glance at figure 5 of the patent, however, shows inside the heater a paper tube closed at the end 20. As the patent states at line 49, steam is generated within this paper tube and passes through the open end thereof 22. As this open end is tied to the hair close to the scalp, here is where the scalding would occur, but for the fact that the steam is supposed to turn back on its course and pass through the narrow space between the paper tube and the inner wall of the heater and escape at vent 12. Counsel for the defendant, in commenting on the fact that it is not disclosed why the steam should take this accommodating course, says that the apparatus claims 3 and 6 of the patent are rendered hopelessly silly by this theory as to vent 12.

However that may be, the defendant does not infringe these claims. Nessler's heater has a vent. Fréderics' heater has no vent. Instead of his paper tube being inclosed by the heater, the paper tube extends through the outer end of the heater and there is no use for a vent. The claims of the patent specify that the tube is closed at one end, and the context shows that this means closed in a sense different from tying it down on the hair, because it is the end 20 that is indicated as the closed end, although the other end, 22, is tied down on the hair. Fréderics ties one end of the tube to the hair and into the other end slips a little wad of cotton, and neither end is closed, within the meaning of the patent as the court below has found.

At the argument it was said that the court below misunderstood this vent, and our attention was called to the fact that the vent is in the *heater* which surrounds the tube, and not in the *tube,* as it is alleged the court thought. We do not see that the court labored under such misapprehension. The language quoted in the brief of counsel indicates to us the reverse of what it indicates to him. The language is as follows:

Claims 3 and 6 "are not infringed because, assuming that good combinations are stated, Frederics' heater has no vent, nor can I think that the end of his projecting tube, pinched and lightly stuffed with cotton, is the equivalent of a vent in the heater furnishing exit for gases issuing from the inner or head end of the tube."

This court is under no misapprehension on that point. We understand that in Nessler's apparatus the vent is in the heater of the patent and at its outer end, and that it is for the gases issuing from the inner end of the curler receiving tube. But it makes no difference whether the vent is in the heater or whether it is in the tube, provided Frederics does not make any use of a vent, and the court below has found that he does not.

If before Nessler it was not known how to produce a permanent wave in hair on the human head, and Nessler through his patent or patents discloses how a permanent wave in such hair can be produced, he would seem entitled to claim patentable invention for what he discovered; but if there is no such thing as a permanent wave in hair, either on or off the head, and if the principle which underlies the subject, as one of the witnesses testifies, "is the same way back from the beginning of the world," and the process of the prior art and Nessler's process produces, as he admits, "practically the same results," Nessler has simply, by substituting an electric heater for a hand iron, been able to steam hair on the head more effectively than was possible by the use of hand irons, or has by the use of an electric heater and a "suitable" lotion, not disclosed, produced a wave which lasts somewhat longer than one produced by the hand iron, we are not prepared to say that he has "discovered" something which he is entitled to patent. If he has in fact made a real discovery in the art, we are inclined to believe that it lies in the "commercial secrets," which he did not wish to disclose, and which cannot be patented until disclosed.

In the hair-dressing art a curler, a tube, a heater, and the use of borax were all old in the art. So it was old in the art to moisten the hair, either with water or with a curling fluid. It was old to use a piece of cloth on the hair, and to saturate the cloth with either water or some kind of curling fluid. It was old to steam the hair and to bake it. One of the witnesses, who testified that he had no interest in the case, said:

"My theory of hair waving is simply that the waving hair principle is the same as we have done years ago. They applied it on the head, the same as off the head. The principle is the same thing, winding the hair around, dampening it with a cloth, or any other way. The only difference is on the head that they are giving a little protection to the ladies, so that they should not burn their heads."

And as one of the witnesses testified:

"The cloth was put around the outside to keep the steam in."

A witness who had been in the hair-dressing business all his life, and whose father had been in the business before him, was asked whether there is a difference between permanent waving as done to-day and as done 25 years ago and he replied that the wave is more permanent now. An excerpt from his testimony follows:

"Q. Is there any difference in the problem of waving hair then and now? A. No; it is the same process.

"Q. And you get a more lasting wave? A. With the modern process.

"Q. Because of what? A. Because of the steam.

"Q. Because of the greater amount of steam? A. Steam and heat produced.

"Q. What is that due to? A. That is due to the electric iron.

"Q. What they have called the electric heater? A. Yes."

The Supreme Court has recently had occasion to once more call attention to a well-established principle in the law of patents. In Grinnell Washing Machine Co. v. Johnson Co., 247 U. S. 426, 38 Sup. Ct. 547, 62 L. Ed. 1196, the court has again declared that a combination of old elements, evolving no new co-operative function, and producing no new result, other than convenience and economy, is not patentable; and the statement made in Richards v. Chase Elevator Co., 158 U. S. 299, 302, 15 Sup. Ct. 831, 833 (39 L. Ed. 991), was repeated as follows:

"Unless the combination accomplishes some new result, the mere multiplicity of elements does not make it patentable. So long as each element performs some old and well-known function, the result is not a patentable combination, but an aggregation of elements."

Decree affirmed.