E. J. MANVILLE MACH. CO. v. EXCELSIOR NEEDLE CO.

(Circuit Court of Appeals, Second Circuit. January 12, 1909.)

No. 137.

1. PATENTS (§ 26*)—PATENTABILITY—COMBINATION.

The fact that a completed product is developed by successive steps in the same machine does not prevent the organized mechanism which produces this result from being considered as a combination.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 27; Dec. Dig. § 26.*]

2. PATENTS (§ 176*)—CONSTRUCTION—PARTS OPERATING "SIMULTANEOUSLY."

The word "simultaneously," used in a patent to describe the operation of the parts of a machine which in fact operate progressively to complete the article produced, must be construed to mean that the parts operate unitedly, harmoniously, and in concord, and not at the same instant of time.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 251, 251½; Dec. Dig. § 176.*

For other definitions, see Words and Phrases, vol. 7, p. 6519.]

3. PATENTS (§ 328*) — INVENTION AND INFRINGEMENT — MACHINE FOR MAKING NIPPLES.

The Campbell patent, No. 594,457, for a machine for forming threaded nipples, such as are used in building wire spoke wheels for bicycles and

———
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

similar vehicles, was not anticipated and discloses invention; also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the District of Connecticut.

The decree of the Circuit Court (162 Fed. 486) sustained claims 1, 2, 3, 4, 5, 23, 24, 25, 26, 27, 28, 31, and 35 of letters patent No. 594,-457, granted November 30, 1897, to Andrew C. Campbell, assignor to the E. J. Manville Machine Company, for improvements in machines for forming threaded nipples from headed blanks. The application was filed May 26, 1897.

Charles L. Sturtevant and Joseph C. Fraley, for appellant.
Oscar W. Jeffery and Edmund Wetmore, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The patent in suit relates to a complicated machine for forming nipples employed in building wire spoke wheels for bicycles and similar vehicles. The drawings contain 29 figures having 146 numbered parts and the description and claims cover 9 closely printed pages containing over 9,000 words. It is obvious that no beneficial result can be obtained by an elaborate description of the machine or a discussion of its minute details. Such a description would unduly extend this opinion and would serve no useful purpose. The parties in interest already understand the machine, presumably, much better than the court, and need no further information or instruction on the subject. We shall content ourselves, therefore by stating our general conclusions as briefly as possible.

The Campbell machine—and the defendant's as well—is a wonderful piece of mechanism. A number of headed blanks, cut from a coil of wire, are thrown promiscuously into the hopper and in a few moments they emerge completed nipples (the slot in the head excepted) drilled, threaded, formed and fitted for use in bicycle and other wheels having suspension spokes. The machine so changed existing conditions that it was not possible for a manufacturer using the old methods to compete successfully with one who used the new machine. The defendant fully recognized this fact and purchased one of the machines soon after the patent was issued. It was operated for about a year. The reason for its abandonment may best be stated in the language of the defendant's superintendent, Dayton, who built the infringing machine. He says:

"I first saw the Campbell machine, I should say, along about 1898. I went to the E. J. Manville Machine Company and bought one machine and we had it shipped here and run it; then we tried to deal with them for a number of machines of their patent, and we couldn't make any arrangements satisfactory; and then I told our people that I could make a better machine for considerable less money."

In other words, the defendant recognized the utility and efficiency of the combination and because it could not agree upon the price of other machines, concluded to build one of its own which does the iden-

tical work of the patented machine in substantially the same way. To the casual observer the defendant's machine differs in appearance from that of the complainant, but upon a more critical examination it is found to contain all the elements of the latter or well-known equivalents therefor. In addition, the defendant has attached a slotter. Its machine does all the Campbell machine does plus the slotting of the nipple. This addition is, of course, immaterial. If the defendant uses the complainant's combination it is of no materiality that it uses something in addition thereto.

The fact that the completed nipple is developed by successive steps in the same machine does not prevent the organized mechanism, which produces this result, from being considered as a combination. Forbush v. Cook, 2 Fish. Pat. Cas. 669, Fed. Cas. No. 4,931; National Cash Reg. Co. v. American Co., 53 Fed. 367, 3 C. C. A. 559. From the very nature of the case the nipple cannot be formed into a commercial device by the simultaneous action of all the parts in the sense that they all act at the same moment and by a single movement of the machine. A construction of the claims requiring such simultaneous action would relegate even such a marvelously organized machine as the Mergenthaler linotype to the unprotected and defenseless class of aggregations. Mergenthaler Co. v. Press Co. (C. C.) 57 Fed. 505.

Campbell produced the first commercially successful nipple maker by doing in a single machine the work which had previously been done by a number of slow, inaccurate and unsuccessful machines, each advancing the nipple a step or more, but none turning out a device which could be transferred to the bicycle makers ready for use. Where it is obvious from the operation of a machine that the various parts do not all co-operate at the same moment, but do operate progressively to produce the desired result, such action is sufficient to avoid the criticism that it is for an aggregation merely. Even though the word "simultaneously" be used it should be construed in the light of the description and drawings and should not be given a harsh and illiberal meaning. In the case at bar the word could not have been intended, in a strict sense, as descriptive of a machine which operates successively in the formation of the nipple. Though the word "simultaneously" applied to such an environment was, perhaps, not well chosen, it can readily be construed to mean that the parts operate unitedly, harmoniously and in concord. In any other sense the word is manifestly a misnomer.

It is admitted that no one of the claims in controversy is anticipated by any of the prior patents. It is, however, argued that the prior art so limits the field of invention that it did not require the exercise of the inventive faculty to produce the Campbell machine. We think the best reference relied on by the defendant is the Timm and Krummel machine and patent. It is unnecessary to decide whether this patent is proved to be prior to Campbell's invention for the reason that, assuming it to be prior, it does not invalidate the patent in suit. The testimony convinces us that the Timm and Krummel machine was never a commercial success. It never got beyond the experimental state. Such nipples as it was able to produce were not of the length demanded by customers and the speed attained was only about one-fourth that

of the Campbell machine. The correspondence between the makers of the machine and would-be customers indicates unquestionably that experiments were still going on and that the machine was at all times in an embryonic condition.

In September, 1896, the makers wrote a letter to the Prentiss Tool & Supply Company, which is an explicit acknowledgment of failure accompanied with a hope that they might be able to do the required work with two machines. They say:

"We regret very much to be obliged to state that our nipple machine will not make nipples as per samples sent us. * * * We are working on a new scheme now, viz., to head and flatten simultaneously and then drill, tap and slot in a second machine."

It does not appear that they ever succeeded in accomplishing the desired result even with the two machines.

The patent covering this machine adds nothing of importance to the discussion. If the machine itself were a failure it is altogether improbable that the patent describes a machine that was a success. The defendant's expert says that the following elements of claims 1, 2 and 5 of the Campbell patent are not found in the machine of the Timm and Krummel patent: (1) A receptacle for receiving the blanks. (2) Jaws for grasping the blanks. (3) Feed mechanisms for transferring the blanks from the receptacle to the jaws of the carrier. (4) An ejector moving independently of the tools for discharging. (5) Jaws of the carrier. (6) Means for opening and closing the jaws of the carrier.

The machine does not feed metal blanks thrown promiscuously into a hopper to the drilling, tapping and milling tools; on the contrary a rod is fed into the machine which is first cut and headed before being subjected to the other operations. This rod must be of exact diameter and the pieces must be cut with the utmost accuracy. The ejector does not move independently of the other tools and there are several minor points upon which it seems unnecessary to dwell for the reason that we are convinced that the Timm and Krummel patent describes one of the several failures which preceded Campbell. There are many points of similarity but the fundamental difference is that one does the work and the other does not. We think that something more than the skill of a mechanic was required to convert the Timm and Krummel machine into a commercial success. In competition with Campbell its inevitable destination was the scrap heap.

The patent to Charles E. Roberts, applied for January 27, 1896, and issued December 1, 1896, is even more remote. It is for an improvement in "machines for finishing spoke-nipples for bicycles." The specification says:

"This invention is designed to cut the nick for the reception of the screwdriver in the heads of the nipples, to slab or flatten the body of the nipple upon opposite sides so as to adapt it to be turned by a wrench and to tap or thread the central bore of the nipple. These several operations have heretofore been performed in separate machines, but are now by my invention combined in one machine which is wholly automatic in its action. The principal feature of my invention is found in the means which I use for cutting the nick and for cutting and slabbing the sides."

As before stated Campbell has no nicker, or slotter, in his machine, therefore the "principal feature" or one of the principal features of Roberts was no feature at all with Campbell. Clearly they had different objects in view and produced different combinations to accomplish them. It seems unnecessary to repeat what is an axiom of patent law that a claim for a combination is not defeated by showing that all the separate elements were old or that several of them had previously been combined. The only question to be considered is, Was the combination old? The nipple is centered, pointed and drilled before it reaches the Roberts machine. Campbell does on one machine what Roberts does on two.

It is evident that the years 1895–97 were periods of great activity in the art and a large number of skilled men were striving to produce a machine which would turn out finished nipples in sufficient numbers to make the machine a commercial success. We have no hesitation in saying that though Timm, Krummel and Roberts displayed ingenuity and ability of a high order, Campbell alone succeeded. The others went a long distance on the road in Campbell's company but he finally passed them and was the first to cross the line.

There can be no doubt as to the defendant's infringement. The machines are different in appearance but an examination will disclose the fact that the defendant has copied the patented machine in all essential features, the differences being of form and not of substance—such as are always produced by the substitution of well-known equivalents for non-essential parts. In Wagner Typewriter Co. v. Wyckoff et al., 151 Fed. 585, 593, 81 C. C. A. 129, we had before us a somewhat similar attempt to avoid infringement by the substitution of equivalents and immaterial changes of parts. What was said in that case is applicable here.

We do not deem it necessary to enter upon an analysis of the claims as we are satisfied with the disposition made of them by the judge of the Circuit Court and agree with what he has said regarding them.

The decree is affirmed with costs.