INDEPENDENT COAL TAR CO. v. CRESSY CONTRACTING CO.

(Circuit Court of Appeals, First Circuit. September 5, 1919.)

No. 1402.

1. PATENTS ⬤⟳328—APPARATUS FOR SPRAYING ROAD SURFACES VALID AND INFRINGED.
   The Pillsbury patent, No. 1,062,029, for apparatus for spraying oil or other surfacing material on roads, discloses a new combination in a unitary structure of old elements, which produces a new and useful result, and is valid; also *held* infringed.

2. PATENTS ⬤⟳26(1)—COACTION OF PARTS UNNECESSARY TO RENDER COMBINATION PATENTABLE.
   It is not necessary, to render a combination patentable, that its elements should act at the same time to secure joint action, but is enough that each contributes to the result which, but for the successive action of each, would not have been produced.

3. PATENTS ⬤⟳243—COMBINATION OF OLD ELEMENTS MAY BE PATENTABLE.
   It is no defense to a claim of infringement that one or more elements of a patented combination, or one or more parts of a patented improvement, may be found in one old patent, and others in another, and still others in a third.

4. PATENTS ⬤⟳172—DESCRIPTION NOT NECESSARILY MEASURE OF INVENTION.
   While the patentee must describe the best mode of applying the principle of his invention, the description does not necessarily measure the invention.

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Massachusetts; George H. Bingham, Judge.

Suit in equity by the Cressey Contracting Company against the Independent Coal Tar Company. Decree for complainant, and defendant appeals. Affirmed.

W. Orison Underwood and Horace Van Everen, both of Boston, Mass., for appellant.

Emery, Booth, Janney & Varney, of Boston, Mass. (Frederick L. Emery, Jesse W. Morton, and Everett S. Emery, all of Boston, Mass., on the brief), for appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and ALDRICH, District Judge.

JOHNSON, Circuit Judge. This is an appeal from a final decree sustaining the validity of patent No. 1,062,029, for apparatus for spraying oil on road surfaces, issued May 20, 1913, to Franklin C. Pillsbury, assignor to Walter H. Cressey, and finding that the same was infringed by the defendant.

[1] The first claim only of the patent is involved in this suit, which reads as follows:

"The combination with a tank wagon having a discharge pipe and a valve in said pipe, of a spray pipe communicating with the discharge pipe, a steam pipe communicating with said discharge pipe intermediate the valve and the tank, whereby steam may be admitted to the tank through the discharge pipe, a steam pipe communicating with said discharge pipe in rear of the valve, whereby steam may be blown through the spray pipe, and means for applying a pressure to the tank above the liquid therein."

Pillsbury, in his application filed in the Patent Office May 27, 1911, conceived that the novelty in his invention consisted in the introduction of steam under pressure directly into the tank of the tank wagon on top of the body of the contents. He then had in mind that the contents would consist of oil, and in his specification he thus describes his apparatus:

"My improved apparatus comprises a spraying attachment adapted to be readily applied to a tank wagon, and means for introducing steam, under pressure, directly into the tank of the tank wagon and on top of the body of oil therein, so that the steam pressure within the tank will furnish the desired pressure for forcing the oil out through the spray device, and will also constitute means for heating the oil in the tank, thus increasing its fluidity, so that it will flow more freely. Where the steam is thus admitted directly to the interior of the tank, said steam will not only force all the oil out of the tank, but when the oil is exhausted the steam will then be discharged through the spray device and during its discharge it will heat and thus increase the fluidity of any oil or other surfacing material which may remain in or upon the spray device; and will also blow out and clean the spray device thoroughly, so that said device will be ready for use again without any further attention as soon as the tank has been filled."

The surfacing material to be used is not confined to oil, as the description contains the following statement:

"My invention is not confined to use in connection with heavy oils, such as are commonly used in surfacing of roads, but may be used in connection with any road-surfacing material which is capable of being sprayed from a tank."

The principal elements of the apparatus set out in the description and shown by the drawings are a tank wagon propelled by steam from a boiler located upon it or drawn by a steam tractor; a tank designed to carry the material to be sprayed upon the road surface and made sufficiently strong to resist internal pressure; at the rear of the tank a discharge pipe, having a valve to shut off the flow from the tank, and connecting with a spray pipe having a series of nozzles similar to that used upon the familiar street sprinkling cart; a steam pipe with a valve in it connecting with the boiler upon the tank wagon, if it has one, or the boiler of the steam tractor, if drawn by that, so that steam under pressure may be supplied through a pipe to the top of the tank above the contents in the same, and also to a coil within the tank for the purpose of heating the contents; a branch of this steam pipe with a valve leading to the rear of the tank, where it branches again, one branch entering the discharge pipe between the valve and the tank and the other between the valve and the spraying device, and each branch having a valve, so that the supply of steam through each may be separately controlled. The advantage of the use of the branching steam pipes at the rear of the tank is stated in the following language:

"The advantage of this construction is that steam may be admitted to the valve 5 on either side thereof, thereby warming the latter; or steam may be admitted directly to the spray device without passing through the tank wagon, if it is desired to heat the oil in the spray device or to blow it out."

None of the original claims contained any mention of these steam pipes, and the combination which Pillsbury claimed as new was:

(1) "The combination with a tank wagon of a spray device connected thereto, a source of steam supply for generating steam under pressure and means to introduce steam under pressure therefrom into the tank above the body of oil therein, whereby the steam in said tank not only furnishes pressure for spraying the oil but also helps heat the oil, and when the oil is exhausted blows out through and cleans the spray device."

All the original claims were rejected, because anticipated by several patents which were cited by the examiner. On reconsideration several times by the Patent Office, amendments involving the same combination were rejected, because anticipated, although these amendments contained, as one element of the combination, the introduction of steam pressure fluid into the discharge pipe in the rear of the valve between it and the spraying device. The claim as allowed abandoned the introduction of steam as a pressure fluid into the tank as one element of the combination, and in place thereof introduced "means for applying a pressure to the tank above the liquid therein."

The only new element which was introduced by the amended claim was:

"A steam pipe communicating with the discharge pipe intermediate the valve and the tank, whereby steam may be admitted to the tank through the discharge pipe."

The Patent Office could find no novelty in a combination by which steam was admitted to the top of the tank above the contents to serve as

a pressure fluid to expel the contents of the tank, nor in the introduction of a steam pipe into the discharge pipe between the valve and the spraying device; but the combination, in which the introduction of a steam pipe between it and the tank was an element, was found to be novel and patentable. Before the patent in suit great difficulty had been experienced in securing a uniform discharge of road surfacing material by any then known device. Earlier patents consisted of a tank wagon equipped with a sprinkling arrangement so constructed as to admit pressure to the top of the tank to force out its contents through the spraying device, with an arrangement also for heating the contents of the tank; but none of them contained the branching steam pipe which enters the discharge pipe on either side of the valve as in Pillsbury's.

The only witness who testified in regard to the operation of one of these stated that:

"The flow was very irregular; the space covered was not perfectly smooth, as was intended; these spaces had to be patched up. This was done by hand with a coal hod or watering pot containing some of the material. This left a space full of humps, or high and low spaces; the high spaces being those filled by hand. The traffic pushed the bunches back and forth, very soon producing holes. The first time I saw this machine, it had no means for cleaning the pipes, with the result that, for several feet after the machine was drawn along, no material came out, and the material that came out was in streaks, which was true after the machine finished."

The Nichol patent, No. 604,479, which had been many times cited against Pillsbury's application before the amendment which was allowed, is a device for spraying the roadbed of a railroad with oil. It has a steam pipe leading into the spray pipe to heat the contents and force the oil out during the process of spraying; but it is evident that its use is confined to oils and materials which are fluid at ordinary temperatures, and is not adapted to the use of either tar or asphalt.

An English patent to Salvisberg for a road-tarring machine, also cited against Pillsbury, closely resembled his patent in its structure, except that it did not have the branching steam pipe which enters the discharge pipe. In it pressure is applied to the contents of the tank above its surface, and they were heated by a steam coil. In this machine, as in others of a similar nature, when tar or asphalt, or any other material which is solid at an ordinary temperature, was used, the discharge pipe between the tank and the valve became clogged with the material, which would harden and congeal when the machine was not in operation, and the valve in the discharge pipe would be so clogged that it could not be moved freely. Material also in the discharge pipe between the valve and the spraying device, and also that left in the spraying device, would harden and congeal, and when, in the operation of the machine, a crosswalk or some space was reached, which it was not desired to cover with surfacing material, and the valve in the discharge pipe was closed, the material would drip from the spray pipe, causing streaks.

In the operation of the patent in suit the tank is filled with surfacing material, which may be oil, tar, or asphalt, and, if this is not hot enough, steam is passed into coils within the tank to heat it.

Steam is then allowed to pass through the steam pipe, entering the discharge pipe in rear of the main valve and through the nozzles of the spray pipe, heating these pipes, and forcing all material from them. Steam is then admitted to the tank above the contents in the same, and is also allowed to pass through the branch pipe, which enters the discharge pipe intermediate its valve and the tank. When the steam is active in the steam pipes on either side of the valve in the discharge pipe, this valve is closed. Each time, before spraying, steam is allowed to enter the discharge pipe and the spraying device in the rear of the valve; but it is only necessary to admit steam through the pipe which enters the discharge pipe intermediate the valve and the tank before the first trip in the morning, unless, the weather is cold, when this is done before each trip. The order in which the valves are used varies. It would seem that the best results would be secured by admitting steam under pressure to the discharge pipe on each side of the valve in it before admitting steam through the pipe leading to the top of the tank. The only witness who testified in regard to it stated:

"I have actually seen sometimes steam put through the valve in the rear of the discharge valve first before steam is put onto the tank for pressure, and sometimes steam is used first to get up your pressure to run the compressor. Sometimes pressure is put onto the tank first; sometimes the steam valve intermediate the tank and the discharge valve is used first."

The Pillsbury machine secures a uniform discharge of tar, asphalt, or heavy oils through the spraying device at all times, whatever the temperature of the air. It provides means for readily opening the valve in the discharge pipe after the apparatus has been used and allowed to stand, and prevents the dripping of the material to be discharged when portions of a street are reached which are not to be covered with the surfacing material. By the introduction of steam through the pipes which enter the discharge pipe upon each side of the valve, the discharge pipe and spraying device are heated and their contents liquefied.

[2] The claim in suit is for a combination none of the elements of which are new. Everybody before Pillsbury knew that pressure exerted upon the fluid contents of a tank would cause a discharge therefrom, and that steam under pressure would heat and liquefy objects which are solid at ordinary temperatures; but the combination of these elements in one structure produced a beneficial and useful result at a time when there was a public demand for a machine which would distribute road surfacing material uniformly and with sufficient force to cause it to penetrate the surface upon which it was used. The question presented for our consideration is whether these elements, in a unitary structure, produce a new and useful result by the co-operation of all. It is claimed that what Pillsbury did was only by mechanical skill to produce an aggregation of elements in which each produced its own result without any co-operation from the others. While it is true that steam is shut off from the pipes which enter the discharge pipe when the machine is in operation and pressure is applied to the contents of the tank, yet it is nevertheless

true that the effect produced by the connection of the steam pipes with the discharge pipe on either side of the valve produces effects which co-operate with those produced by pressure upon the material in the tank; for, by the action of the steam upon the material in the discharge pipes and upon the pipes themselves, the pipes have been heated and the material in them liquefied, so that it will flow freely, and this heated condition of the spray pipe, discharge pipe and valve in the discharge pipe continues while material from the tank is being forced out through the same. The separate effects produced by all the elements contribute to one result, viz. a free and uniform flow of the material through the discharge pipe and out of the spraying device, with sufficient force to drive it into the surface which it strikes. It is not necessary, to render a combination patentable, that its elements should act at the same time to secure joint action; but it is enough that each contributes to the result which, but for the successive action of each, would not have been produced. Forbush v. Cook, 2 Fish. Pat. Cas. 669, Fed. Cas. No. 4931; National Cash Register Co. v. American Co., 53 Fed. 367, 3 C. C. A. 559; E. J. Manville Mach. Co. v. Excelsior Needle Co., 167 Fed. 538, 93 C. C. A. 216; Novelty Glass Mfg. Co. v. Brookfield, 170 Fed. 946, 95 C. C. A. 516; Sanders v. Hancock, 128 Fed. 424, 63 C. C. A. 166; National Tube Co. v. Aiken, 163 Fed. 254, 91 C. C. A. 114.

Even if the Nichol patent and the English patent to Salvisberg for road-tarring machines, and other prior patents, taught Pillsbury that the fluid contents of the tank could be forced from the same by steam pressure applied from above; and even if the Grun patent, No. 666,-051, had taught him that the discharge pipe and the spraying device could be cleared out by the introduction of a pressure fluid into the same in the rear of the valve in the discharge pipe; or if the Darrin patent, No. 839,119, had taught him that steam admitted under pressure into the discharge pipe on each side of the valve in the same would liquefy the contents of the discharge pipe and the spraying device, and heat the pipes so that the liquid which entered them would not be hardened by the coldness of the pipes, no unitary structure possessing all of the elements of his combination was cited against him, and it is admitted that there was none. The Grun patent was an apparatus designed for the distribution of beer and other fermented liquors, in which a tank wagon for delivering beer and other fermented liquors had a receiver for carbonic acid gas supported on the wheel frame of the tank, from which pressure was supplied to the contents of the tank and also the discharge pipe beyond the valve in the same, but not between the valve and the tank, so that, after a receptacle had been filled with liquor from the tank, the carbonic acid gas could be shut off from the tank and caused to flow through the hose connecting the tank with the receptacle, thus forcing the beer from it and the standpipe. It is evident, however, that the purpose of forcing the carbonic acid gas through the discharge hose is not only to force the beer out of the same, but also to supply a charge of carbonic acid gas to the standpipe connected with the receptacle for beer, and that the Grun patent does not disclose a combination which,

in a unitary structure, accomplishes the result that Pillsbury accomplished. It is only a beer delivery wagon, and designed for an entirely different use from that of the Pillsbury patent. The Darrin patent, upon which the appellant relies as showing that the introduction by Pillsbury of steam under pressure into the discharge pipe on each side of the valve in the same had been anticipated, is an apparatus for the distillation of resinous woods for abstracting therefrom turpentine, pitch, tar, tar oil, and pyroligneous acid. After the process of distillation has been carried on for some time, a valve in the pipe connecting the retort with the condenser is closed, and then steam admitted to this connecting pipe on either side of the valve for the purpose of cleaning out the condensations which may have gathered in the conduit pipe, and which would stain or discolor the turpentine passing through it, and which are revaporized and blown out through a threeway valve.

Pillsbury, however, made use of the introduction of steam into the discharge pipe on either side of the valve, not only for the purpose of cleaning out the pipe, but also for the purpose of heating and liquefying its contents, thus accelerating their flow, and also for heating the valve so that it might be opened freely. As a unitary structure the Darrin patent in no way resembles the Pillsbury patent, nor is the introduction of steam into the discharge pipe employed for the same purpose. The use of steam to clean and scour out the interior of a pipe, or to heat it and liquefy its contents, is a matter of such common knowledge that we do not think it can be said that any information was necessary in regard to its use for these purposes. But, admitting that all of the elements of the Pillsbury patent are old, as we think they are, he nevertheless produced by their combination in his patent a unitary structure in which they all co-operate to produce a new and beneficial result, viz. the free and uniform discharge of heavy oil, tar, and asphalt upon a road surface with sufficient force to cause penetration to a depth desired for practical purposes, with means for clearing out the spraying device when it is desired to suspend the process of sprinkling, so that there will not be a dripping and streaks caused over surfaces which it is not desired to cover, and also means for freeing the valve in the discharge pipe when it stuck.

[3] None of the patents cited in the Patent Office or by the appellant disclose the combination of Pillsbury or any single machine that produced the same result; but it is claimed that all the elements of Pillsbury are contained in earlier patents, none of which contains them all. It is no defense to a claim of infringement that one or more elements of a patented combination, or one or more parts of a patented improvement, may be found in one old patent, and others in another, and still others in a third. J. L. Owens Co. v. Twin City Separator Co., 168 Fed. 259, 93 C. C. A. 561; Imhaeuser v. Buerk, 101 U. S. 647, 660, 25 L. Ed. 945; Bates v. Coe, 98 U. S. 31, 40, 25 L. Ed. 68.

It is further claimed by the appellant that Pillsbury in his specifications limited the use which can be made of the introduction of steam

into the discharge pipe between the valve and the tank by the "whereby clause," which reads as follows:

"whereby steam may be admitted to the tank through the discharge pipe"

—and that, the use of this pipe being so limited, the claim is void because inoperative; that with steam admitted to the top of the tank above the contents in the same it would not be possible to force steam under pressure from the same source into the tank through the discharge pipe.

We do not think that the patentee is limited by this "whereby clause" solely to the use expressed in it, provided the elementary structure which he specified is capable of other uses. Nor do we find it necessary, as did the District Court, to treat the "whereby clause" as surplusage, because it is evident from the structure of the combination, as shown by the drawings, that, if steam is inactive in the tank, and the valve in the discharge pipe is closed and steam admitted through the pipe leading to the discharge pipe between the valve and the tank, steam will be admitted to the tank. It is also evident that one of the practical uses of this steam pipe in the combination is to clear the section of the discharge pipe between the tank and the valve, and also the entrance into the discharge pipe from the tank, and this can be done when the steam is shut off from entering the top of the tank and is admitted into the tank through this steam pipe which enters the discharge pipe, which would liquefy and blow back into the tank any of the surfacing material which clogged that part of the discharge pipe between the tank and the valve, and would at the same time accomplish the purpose, which Pillsbury pointed out as an advantage in his specification, of warming the valve.

We think this function is plainly inherent in the combination covered by Pillsbury's claim and in the arrangement of pipes shown in his drawings and described in his specification. The necessity for the use of this steam pipe at the beginning of the day's work with the machine demonstrates that when the machine was not in use the tar must have become solidified in this part of the discharge pipe, and that before the machine can be successfully operated and the valve opened steam must be applied here for the purpose of heating and liquefying the contents of the pipe and any material which may have adhered to the valve, and that particularly in cold weather would this be necessary, as then steam must be admitted through this pipe at the beginning of each trip.

The appellant has found it to be an advantage to copy the construction of pipes of the Pillsbury patent, and the testimony of the witness who saw the uses to which it was put in heating the valve when it stuck, upon the appellant's machine, demonstrates that it was found to be operative. It is also claimed by the appellant in argument that there is no discharge pipe between the main valve 5 and the tank, but that the valve connects directly with the tank. The drawings disclose, however, in Figures 2 and 3, a discharge pipe at this point and a steam pipe entering it here.

[4] It is admitted by the appellant that, if this claim is valid, it is infringed by the appellant's machine, in which steam is used as a pressure fluid to expel the contents of the tank; but it strenuously contends that, even if it be valid, it is not infringed by its machine in which pressure is supplied to the tank by an air-compressing pump. In support of this contention our attention is called to the statement made by Pillsbury in his application, which, it is claimed, limits the pressure to be used upon the contents of the tank to that exerted by steam. This statement is as follows:

"I am aware that it has heretofore been proposed to admit compressed air to the oil containing tank with which a spray device is used, for the purpose of providing within the tank a suitable pressure to force the liquid out through the spraying device. My invention is to be distinguished from devices of this nature, however, in that the pressure is secured by the use of steam, which is admitted under pressure directly to the tank, and which has the capacity for not only heating the oil within the tank, but also cleaning out automatically the spray device."

It appears from the file wrapper and its contents in the case that, when Pillsbury made this statement, he supposed his invention lay in providing steam pressure within the tank to force out its contents, and the claim which he then made, and which we have quoted, showed that he believed the merit of his invention to reside in this. But, after the rejection of this claim upon references to prior patents, he canceled all his original claims, and, after an interview between himself and attorney and the principal examiner, he filed the amended claim, which is the one in suit, in which the pressure to be applied above the contents of the tank was not limited to steam, but was broadened to include any "means of applying pressure to the tank above the liquid therein." No amendment was made to the description, nor the drawing, and none was necessary. The dominant feature of the combination which made it novel and patentable was the pipes that entered the discharge pipe on each side of the valve in the same. It was important for the successful operation of the combination that pressure be exerted upon the top of the contents of the tank; but it was unimportant whether it be supplied by steam or by any other means. The inventor was therefore allowed a broad scope for this element in his combination.

It is apparent from the history of the progress of the case through the Patent Office, as shown by the file wrapper and its contents, that, after the original claims were rejected upon references to earlier patents, the statement made by the inventor in his description in regard to the use of steam as pressure in the tank was not intended to limit the combination for which a patent was allowed to the use of steam alone for this purpose, for it became immaterial what pressure fluid should be exerted upon the contents of the tank. The branching steam pipe, in combination with a pressure fluid applied above the contents of the tank, was specified in his description and drawings, and Pillsbury could legally file an amended claim for a combination which would contain as one of its elements any means for applying

pressure to the contents of the tank, for, although he had suggested steam, the principle would remain the same, whether that or other means for introducing pressure within the tank were employed.

"The claims measure the invention, and while the inventor must describe the best mode of applying the principle of his invention the description does not necessarily measure the invention." Paper Bag Patent Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122.

We think the District Court correctly held that the claim in suit is valid, and that it is infringed, not only by the machine of the appellant, in which steam is used to force out the contents of the tank, but also by its machine in which compressed air is used for the same purpose.

· The decree of the District Court is affirmed, with costs to the appellee in this court.