**INDEPENDENT OIL WELL CEMENTING CO. v. HALLIBURTON et al.***

No. 468.

Circuit Court of Appeals, Tenth Circuit.

Jan. 11, 1932.

*Rehearing denied February 15, 1932.

Arthur C. Brown, of Kansas City, Mo. (C. E. Hall and Hall & Thompson, all of Oklahoma City, Okl., on the brief), for appellant.

Leonard S. Lyon, of Los Angeles, Cal. (Henry S. Richmond, of Los Angeles, Cal., Hubert Ambrister, of Oklahoma City, Okl., and Ben F. Saye, of Duncan, Okl., on the brief), for appellees.

Before COTTERAL and PHILLIPS, Circuit Judges, and JOHNSON, District Judge.

PHILLIPS, Circuit Judge.

Erle P. Halliburton and Halliburton Oil Well Cementing Company brought this suit against the Independent Oil Well Cementing Company for infringement of patents 1,486,-883 and 1,500,385. Halliburton is the patentee and owner of the patents in suit, and the Halliburton Oil Well Cementing Company is the exclusive licensee thereunder for the Mid-Continent Oil Field, which includes Oklahoma. The trial court held the patents valid and infringed, and entered a decree accordingly.

Patent 1,486,883 was applied for June 20, 1922, and was issued March 18, 1924. It is for a method of hydrating cement and other comminuted materials.

Patent 1,500,385 was applied for January 4, 1924, and was issued July 8, 1924. It is for a method of hydrating cement and other comminuted materials and conveying such mixture to the point of use, with the speed of the mixing process and the speed of the conveying operation so synchronized that no substantial setting of the mixture takes place before it is deposited at the place it is intended to remain, and for devices to carry out the methods of both patents.

Hydrating cement consists in enveloping the particles of cement with water to bring about the chemical action which produces setting or hardening of the cement.

While the inventions of the patents in suit are not so limited, they were primarily intended to provide a new method of mixing and conveying cement and a new means for employing the same in the cementing of oil wells. The cementing of an oil well is usually accomplished in the following manner. A string of pipe is lowered into the well so that it extends from the top of the well to a point shortly off the bottom of the hole. Neat cement, which is a mixture of water and Portland cement, is pumped down this pipe and forced through the bottom up around the outside of the pipe and there allowed to set. After it has set the hole is drilled through the cement. The purpose of the operation is to shut off water that flows in from the adjacent strata and down the outside of the pipe.

Prior to the Halliburton inventions, it was standard practice to mix such cement by hand. Mechanical mixers were tried but were not satisfactory, because they did not assure a proper proportioning of the cement and water.

The method of hydrating cement under the patents in suit contemplates the projection of a high velocity stream of water into a cement mixing chamber, the depositing of the dry cement into a hopper adjacent to such high velocity stream, the creation of a region of reduced pressure or suction by means of such high velocity stream, the drawing of the particles of dry cement into the stream by reason of such suction, the entraining of the cement in the stream, the mixing of the cement and water by the impact of the particles of water of the high velocity stream against the particles of dry cement, and the carrying of the mixture through the outlet of the mixing chamber by the force of such stream.

Figure II of the patent drawings illustrates an apparatus suitable for carrying out such method, and is as follows:

The apparatus is provided with a hopper 9 into which the cement is fed from the supply sacks. When in operation, the hopper is

902

kept approximately full. Below the hopper is a mixing chamber 5. 19 is a fluid conducting pipe through which water is forced under high pressure. The water passes through a nozzle 16 and, by reason of the restriction of the nozzle and the pressure of the water, a high velocity stream of water is projected from such nozzle into the mixing chamber. This high velocity stream produces a zone of reduced pressure and causes what is commonly called suction. This suction draws the dry cement into the high velocity stream and the force of the impact on the cement breaks up the column of cement into particles, forces away the envelope of air about the particles of cement, and covers such particles with a film of moisture. The outlet of the mixing chamber 21 is smaller than the mixing chamber. This slightly retards the passing of water and cement through the mixing chamber and insures complete hydration of the cement particles. The consistency of the mixture may be varied by changing the size of the nozzle. The quantity of the mixture produced may be regulated by increasing or decreasing the velocity of the stream of water. If the velocity of the stream is increased or decreased, the amount of dry cement drawn in will increase or decrease in fixed proportion and the consistency of the mixture will remain constant. The cement and water are proportioned and mixed by means of suction and force inherent in a high velocity stream of water.

When he ascertained that increasing or decreasing the velocity of the stream would vary the quantity of the mixture, but that the proportions of cement and water would remain constant, Halliburton empirically discovered a new principle which underlies his inventions.

█ Patent 1,500,385 was filed as a continuation of, and during the time the application for patent 1,486,883 was pending. The patent office examiner ruled that the mixing art was classified in Division 25, and the conveying art in Division 4 of the patent office, and that only claims referring to mixing per se could be retained in the first patent. Thereupon the claims now appearing in the second patent were canceled from the application for the first patent, but with notice that they were not abandoned but reserved for the second application. The claims of the first and second patents are not co-extensive. Such being the facts it is clear that the first patent is not an anticipation of the second. Anderson v. Collins (C. C. A. 8) 122 F. 451, 458; Ryan v. Newark Spring Mattress Co. (C. C.

N. J.) 96 F. 101, 103; Nestle Pat. Holding Co. v. E. Frederics, Inc. (C. C. A. 2) 261 F. 780.

Figures 5 and 9 of the patent drawings in the second patent are as follows:

The mixing per se is the same as in the first patent. It is accomplished by means of a mixing pump 45, water supply line 51, nozzle 8a by means of which a high velocity stream of water is introduced into the mixing chamber 7, which draws in the cement from the hopper 5, hydrates the same and deposits it in container 54. The fluid cement is then drawn from container 54 by delivery pump 46 and pumped into the well.

During the cementing of an oil well, conditions may arise that render it necessary to vary from time to time the rate at which the cement is being pumped into the well. For example the earth may cave in, requiring the operator to slow down the delivery of cement into the well, or the cement may siphon, requiring the operator to speed up such delivery. After the cement has been hydrated it must not be permitted to stand for any substantial period before it is put in place, because if the chemical process of setting or hardening is permitted to take place to an appreciable degree the quality of the mixture is impaired. It is desirable therefore that the mixing of the cement should be speeded up or slowed down as the speed of the delivery of the cement into the well is increased or decreased. Under the methods of the second patent this is accomplished by simultaneously increasing or decreasing the speed of both the mixing pump 45 and the delivery pump 46. Changing the speed of the delivery pump increases or decreases the rate at which the cement mixture is fed into the well. Changing the speed of the mixing

pump changes both the velocity and quantity of the water passing into the mixing chamber, and in fixed proportion the amount of dry cement drawn into the mixing chamber. Thus, by changing the speed of the pumps, the quantity of mixture produced and conveyed may be varied without changing the consistency of the mixture. It will be noted that the new principle discovered by Halliburton that one may vary the quantity of the mixture produced by adjusting the velocity of the stream of water and at the same time keep the proportions of water and cement constant and the consistency of the mixture uniform is an essential element in the synchronous method of mixing and conveying cement to the point of use of the second patent.

The claims of the first patent, which embody the hydraulic principle for proportioning the cement and water and mixing the same, are set out in marginal Note 1.[1]

---

[1] Note 1.

"5. The method of reducing cement and its content to a state of moist fluidity which comprises depositing the cement adjacent to a mixing chamber and directing a high velocity stream or current of liquid only into the mixing chamber for creating a partial vacuum therein for inducting cement into said chamber and for mixing the cement and liquid to cause the liquid to penetrate the particles of cement.

"6. The method of producing a fluent mixture of liquid and cement, which comprises depositing the cement adjacent to a mixing chamber and directing a high velocity stream or current only of such liquid through the mixing chamber for creating a region of suction therein for inducting cement into said chamber at a rate proportional to the rate of flow of said stream and for synchronously with said induction mixing the cement and liquid to cause the liquid to penetrate the particles of cement."

"8. The method of producing a fluent mixture of liquid and cement which comprises mixing the cement and such liquid in substantially a vacuum created only by the action of a high velocity stream or current of such liquid, and varying the rate of flow of such liquid for varying the quantity of mixture produced.

"9. The method of producing a fluent mixture of liquid and cement which comprises mixing the cement and such liquid in substantially a vacuum created only by the action of a high velocity stream or current of such liquid, discharging the mixture subject to a limited retardation and varying the rate of flow of such liquid for varying the quantity of mixture produced.

"10. The method of producing a fluent mixture of cement and a liquid, which comprises depositing cement adjacent to a mixing chamber and inducting the cement into said chamber and simultaneously mixing and discharging such cement subject to retardation in the presence of a partial vacuum created solely by the action of a high velocity stream of such liquid.

"11. The method of producing a fluent mixture of cement and liquid, which comprises producing a high velocity stream or current of such liquid which forms the sole medium for creating a region of suction in a mixing chamber, and depositing the cement adjacent to said chamber for permitting such stream or current of liquid to advance the cement in response to the action and in the pres-

---

The claims of the second patent which embody such principle are set out in marginal Note 2.[2]

---

ence of such suction, and imposing limited retardation on the mixture to bring the liquid and cement into intimate association for producing an absorption of the liquid by the particles of cement.

"12. The method of producing a fluent mixture of liquid and cement which comprises creating a reduced atmospheric pressure in a chamber solely by a high velocity stream or current of such liquid for inducting such cement into said stream or current and retarding the discharge of the liquid mixture to cause said stream to create an increased atmospheric pressure in such chamber for impregnating the particles of cement with such liquid."

[2] Note 2.

"1. A mixing device comprising an upright substantially cylindrical mixing chamber, a lateral outlet conduit having therein a constricted zone, means for introducing a jet of liquid at high velocity into said upright mixing chamber, such introduction being in the direction of the mass at the point of such introduction, means for delivering solid pulverulent material directly into said mixing chamber."

"10. A mixer for producing fluid cement grout, including a feed hopper, a substantially cylindrical mixing chamber mounted below the same and adapted to receive dry cement therefrom, said chamber being wholly unobstructed interiorly, a downwardly projecting nozzle substantially concentric with said mixing chamber and terminating at near the upper end of said mixing chamber, and means for supplying liquid under pressure to said nozzle.

"11. A mixer for producing fluid cement grout, including a feed hopper, a substantially cylindrical chamber mounted below the same and adapted to receive dry cement therefrom, a free unobstructed opening being provided from said hopper into said mixing chamber, a downwardly projecting nozzle substantially concentric with said mixing chamber and terminating at near the upper end of said mixing chamber, and means for supplying liquid under pressure to said nozzle, an outlet conduit leading from said mixing chamber having a portion thereof adapted to impede the efflux of said grout through the same."

"14. The process of continuously feeding dry cement and for continuously reducing same to plastic state, which includes, induction, by a high velocity stream of water, of a quantity of dry cement into said stream for reducing the cement to plastic state, delivering such plastic cement to a temporary storage tank, controlling the velocity of said stream of water for varying the quantity of mixture delivered to the storage tank, then substantially continuously delivering such plastic cement from said tank under pressure by an independent source of pressure to a point of use, and varying the secondary source of pressure to feed the plastic mixture in accordance with the rate of mixture and delivery to said storage tank.

"15. The process of feeding dry cement and for reducing same to plastic state, which includes induction, by a high velocity stream of water, of dry cement into said stream for reducing the cement to plastic state, delivering such plastic cement to a temporary storage tank, controlling the velocity of said stream of water for varying the quantity of mixture delivered thereby, then delivering such plastic cement from said storage tank by an independent source of pressure to a point of use, and then varying both the velocity of said stream and the secondary source of pressure so that the rate of delivery is substantially synchronized with the rate of mixture."

"27. In apparatus for treating and handling cement for cementing wells or the like, the combina-

904

While the decree of the trial court generally adjudged the patents valid and infringed, the memorandum opinion of the trial judge shows he had in mind the claims embracing the hydraulic principle for proportioning and mixing cement with water of the first patent, and the synchronous method of the second patent, and devices for carrying out such methods.

We now pass to a consideration of certain prior patents and prior uses, which the defendant cites and relies upon as anticipations of the patents in suit.

The Schaffer patent 1,220,995 is for an apparatus for hydrating lime. It employs downwardly directed sprays of water in part to hydrate the lime, but it does not disclose a high velocity stream of water solely for mixing lime and water, nor a high velocity stream of water for inducting the lime into the mixing chamber and proportioning the lime and water.

The Faller patent 998,762 is for an apparatus for combining comminuted solids and liquids. It employs a jet of liquid for mixing the liquid with the solids, while the solids are suspended in a current of air, but it does not disclose a high velocity stream of water for proportioning the solids and liquids.

The McMichaels patent 1,127,660 is for a method and apparatus for transporting concrete. Under it the cement and aggregate are measured and placed in a closed container. After being so placed, air pressure is developed upon the top of the mass of concrete, and water is introduced in the forward part of the aggregate mass to lubricate the ingredients thereof. The compressed air which acts on the top surface of the mass is supplemented by a high velocity stream of air near the forward part of the mass to assist in mixing and in moving the mass up through the delivery pipe. The water introduced into the apparatus does not function to proportion the cement and water, or the cement, water, and aggregate. The patent discloses a high velocity stream of air for the purpose of mixing the several ingredients but not for proportioning them.

The DuRell patent 1,157,092 is for a

tion of means for introducing a stream of liquid under high velocity into a mixing chamber, means for introducing cement under the influence of and into said stream for mixing the liquid and said cement, means for arresting flow of the mixture for a period sufficient to permit the escape of free air from the mixture, and means for substantially continuously delivering the mixture to a point for use."

mixer and disintegrator. The patent drawings are as follows:

The device consists of a casing 1, and truncated cone 2 with its truncated end hanging downwardly into the casing and its base connected rigidly with the upper end of the casing, a vertically positioned adjustable vortex nozzle 8 to force a liquid into and through the truncation of the cone, a chute 13 to direct the solid materials into the cone and holes in the cone to allow the mixture to boil and agitate above and below the cone, and a discharge opening 5. The specification of the patent states: "The liquid coming out of the vortex jet 8, being forced into and through the truncation 4 of the cone 2, causes a violent boiling and agitation in the mixer, by which the mixture from below the cone 2 is running back through the holes 7 from where it is again and again forced into and through the truncated cone 2. By this boiling and agitation, any solid, as sand, clay and the like, which can be broken up by a jet, being fed into the mixer by the chutes 12, will be mixed with the liquid coming out from the vortex jet 8, and it will be mixed also with any additional gas or other liquid to be discharged into the mixer from the tubes 14, agitating, disintegrating and mixing, as any heavy piece will sooner go through the lower holes 7 in the cone 2 before it will escape through the discharge opening 5, and thus a good equalized stream will flow out of the mixer at the discharge opening 5." While this patent discloses a high velocity stream of liquid in connection with a truncated cone for the pur-

pose of mixing liquid and solid materials, it does not disclose a high velocity stream of water as a means for proportioning and mixing cement and water, and the high velocity jet is not designed to draw in the solid materials nor control the proportions of liquid and solid materials. Such was the conclusion of the United States District Court for the Southern District of California in Halliburton & Perkins Oil Well Cementing Co. v. California Oil Well Cementing Co. (Equity H-85-B).[1]

Counsel for defendant place strong reliance upon the Scott mixer, used as early as 1910. The evidence clearly established, and the trial court found, that Scott's device was a purely mechanical mixer, and that it did not employ a high velocity stream of water for proportioning and mixing cement and water. The Scott mixer has a mixing chamber or barrel with a shaft extending axially through the barrel, upon which shaft are mounted blades or paddles of the shape of a propeller blade. Above the mixing chamber there is a hopper with an outlet at the bottom regulated by a sliding iron door. The amount of cement fed from the hopper into the mixing chamber is regulated by manipulation, by means of a lever, of this sheet iron door. Water is introduced through two two-inch pipes which open into the head of the mixing chamber opposite the blades at the end of the shaft. The amount of water is regulated by valves in such pipes. The cement and water are proportioned by manually regulating the opening at the outlet of the hopper and the valves in the water pipes. The cement and water are mixed in the mixing chamber mechanically by the power driven blades which mix and force the cement out through the outlet at the end of the mixing barrel into a tank. A delivery pump draws the cement from such tank and delivers it into the well. If for any reason the speed of the delivery pump is varied, it is necessary to manually adjust the door on the hopper to vary the amount of cement fed into the mixing chamber, and to manually regulate the valves on the water lines to vary the amount of water fed into the mixing chamber. If a high velocity stream of water were projected into the mixing chamber, it would be broken up by the blades. The water and cement are not proportioned and mixed by means of a high velocity stream of water.

We have examined the other patents and prior uses relied upon and are of the opinion that they do not employ a high velocity

stream of water to proportion and mix the cement and water, do not anticipate the claims above set out of the patents in suit, and do not merit specific discussion.

Counsel for defendant contend that the claims of the second patent in suit are mere aggregations and not patentable combinations.

With respect to the result produced, it is not essential that it be a wholly new result, but it is sufficient if an old result is effected in a more facile, economical, or efficient way. Galvin Elec. Mfg. Co. v. Emerson Elec. Mfg. Co. (C. C. A. 8) 19 F.(2d) 885, 888; Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co. (C. C. A. 8) 215 F. 362, 369; New York Scaffolding Co. v. Whitney (C. C. A. 8) 224 F. 452, 456; National Hollow Brake-Beam Co. v. Interchangeable B.-B. Co. (C. C. A. 8) 106 F. 693, 706, 707; Skinner Bros. Belting Co. v. Oil Well Imp. Co. (C. C. A. 10) 54 F.(2d) 896; Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U. S. 426, 432, 38 S. Ct. 547, 62 L. Ed. 1196.

When the respective individual functions of the elements assembled are not changed and where they produce no result other than the added results of such functions, there is a mere aggregation of elements. Pelton Water-Wheel Co. v. Doble (C. C. A. 9) 190 F. 760, 766; Jones-McLaughlin, Inc., v. Amerada Petroleum Corp. (C. C. A. 10) 47 F.(2d) 828, 830.

When the elements are so united that by their reciprocal influence upon each other, or by their joint action on a common objective, they perform additional functions and accomplish additional results, the union is a true combination. Stutz v. Armstrong (C. C. Pa.) 20 F. 843; United States Hoffman Machinery Corp. v. Pantex Pressing Mach. Co., Inc. (D. C. Del.) 35 F.(2d) 523, 525.

The result must be due to the joint and co-operative action of all the elements, not a mere aggregation of the several results of the separate elements acting independently (National Cash Register Co. v. American Cash-Register Co. [C. C. A. 3] 53 F. 367, 371; Anton v. Grier Bros. Co. [C. C. A. 3] 185 F. 796; Goodyear Tire & Rubber Co. v. Rubber Tire Wheel Co. [C. C. A. 6] 116 F. 363, 370); it must be the product of the combination and not a mere aggregate of several results, each a complete product of one of the combined elements. Muser v. Bell (C. C. A. 2) 278 F. 904, 910; Victor Cooler Door Co. v. Jamison Cold Storage Door Co. (C. C. A. 4) 44 F.(2d) 288, 293; Pelton Water Wheel

[1] No opinion filed.

Co. v. Doble (C. C. A. 9) 190 F. 760, 766; Grinnell Wash. Machine Co. v. E. E. Johnson Co., 247 U. S. 426, 432, 38 S. Ct. 547, 62 L. Ed. 1196; Palmer v. Corning, 156 U. S. 342, 15 S. Ct. 381, 39 L. Ed. 445; Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L. Ed. 241; Reckendorfer v. Faber, 92 U. S. 347, 357, 23 L. Ed. 719.

It is not necessary that the action of the elements be simultaneous. Independent Coal Tar Co. v. Cressy Contracting Co. (C. C. A. 1) 260 F. 463, 468; Willard v. Union Tool Co. (C. C. A. 9) 253 F. 48, 53; Novelty Glass Mfg. Co. v. Brookfield (C. C. A. 3) 170 F. 946, 954; Manville Mach. Co. v. Excelsior Needle Co. (C. C. A. 2) 167 F. 538, 540; Forbush v. Cook, 9 Fed. Cas. page 423, No. 4931; Reckendorfer v. Faber, 92 U. S. 347, 357, 23 L. Ed. 719. Neither is it necessary that the mutual interaction of the elements be constant. Lyman Mfg. Co. v. Bassick Mfg. Co. (C. C. A. 6) 18 F. (2d) 29, 33. Nor is it objectionable that the joint action which produces the unitary result comes through the mediation of the operator or from the operating force. Dudlo Mfg. Co. v. Varley Duplex Magnet Co. (C. C. A. 7) 253 F. 745; Krell Auto Grand Piano Co. v. Story & Clark Co. (C. C. A. 7) 207 F. 946. It is sufficient that the elements so co-act or co-operate that as a consequence of their union a new and useful result or an old result in a more facile, economical, or efficient way, and not a mere aggregation of the product of each element, is produced. Ohmer Fare Register Co. v. Ohmer (C. C. A. 6) 238 F. 182, 190; International Mausoleum Co. v. Sievert (C. C. A. 6) 213 F. 225, 229; National Cash Register Co. v. American Cash Register Co. (C. C. A. 3) 53 F. 367, 371.

The distinction between a combination and an aggregation is aptly stated by Robinson in his work on Patents, vol. 1, §§ 154, 155, and 156, as follows:

"Where operations or instruments are * * * united, one of two results must follow. Either each element remains unchanged in function and effect; or by the action of the elements upon each other, or their joint action on their common object, they perform additional functions and accomplish additional effects. The former union is a mere collocation or aggregation of the elements. Although they have been brought together in an apparent organism and rendered more available for use, they still remain the same distinct and independent means, still acting as so many separate units and not co-operating with each other to perform additional functions and accomplish additional results. Such unions, therefore, are not the creation of new means. They do not involve an exercise of the inventive faculties, nor can they be protected by a patent.

"But when these elements are so united that by their reciprocal influence upon each other, or their joint action on their common object, they perform additional functions and accomplish additional results, the union is a true combination. While every element remains a unit, retaining its own individuality and identity as a complete and operative means, their combination embodies an entirely new idea of means, and thus becomes another unit, whose essential attributes depend on the co-operative union of the elements of which it is composed. Such a combination is a different invention from the elements themselves, whether considered in their separate or their aggregated state, the method of their co-operation in the combination being the result of the inventive act. Whether the elements are new or old, and whether they co-act successively or simultaneously is of no importance. To unite them in a new means by the exercise of inventive skill is invention, and renders the combination, as an entirety, the subject-matter of a patent.

"This union of elemental instruments or operations in a new operation or instrument must necessarily produce effects beyond the sum of the effects producible by all the elements in their separated state. This is often the only test by which a combination can be distinguished from an aggregation, and is the one usually applied by the courts. And it is certainly reliable. For since diversity of end necessitates diversity of means, if the new combination accomplishes results that could not have been achieved either by its individual or collective elements, their union must inevitably have brought into action some new or as yet unawakened energy, which constitutes a new and independent means."

The primary object of the second patent is to provide a method and apparatus for mixing water and cement and for conveying the mixture to the point of use and depositing it in its final form before its quality has been impaired by setting or hardening to an appreciable degree. This is a unitary result produced by the combined forces of the mixer and conveyer, and it could only be accomplished by maintaining a synchronous relation between the speed of the mixer and the speed of the conveyer. While it is true that the mixer mixes the cement and the conveyer thereafter takes it and conveys it to the point

of use, yet it is because of co-operation and co-ordination between the two that the object of depositing the mixture in place with such speed as conditions permit and require and with the quality unimpaired by reason of the setting or hardening of the cement is accomplished. There is co-ordination of action between the mixer and the conveyer in that their speeds are synchronized; there is co-operation in that one mixes and the other conveys, and the mixture produced by the former exactly equals that which the latter immediately conveys and puts in place. This co-ordination and co-operation is possible because the speed of the mixer can be controlled by regulating the pressure and velocity of the stream of water which proportions and mixes the cement and water. The result produced is more than the aggregate of mixing and conveying, it is mixing and conveying in synchronous relation so that the cement is put in place with its quality unimpaired. While the result is old, it is accomplished in a new and more facile, economical, and efficient way.

We conclude that the claims of the second patent in suit, set out in Note 2, are patentable combinations.

The alleged infringing method and apparatus are illustrated by the following drawings:

Counsel for defendant contend that its method does not embrace and its apparatus does not employ a high velocity stream of water to proportion and mix the cement and water, but that it uses a mechanical means to induct the cement into the mixing chamber and to hydrate the cement.

Defendant's mixer consists of a hopper similar in shape to an inverted truncated pyramid. Beneath this hopper is a cylinder 2. Between the hopper and cylinder is a throat or opening 1 which connects the hopper and the cylinder. In the hopper is a one-inch pipe 3 extending horizontally and adjacent to one side of the hopper. In this pipe are seven holes 4, approximately five-sixteenths of an inch in diameter and three and one-eighth inches apart. On the side opposite the water pipe is a screw type of auger or helix 5. A shaft 12 extends through the cylindrical chamber and on it is mounted paddles 6 approximately two and one-half inches apart. These paddles are set at a slight angle and are arranged spirally around the shaft. The auger 5 in the hopper and the paddles 6 in the cylindrical chamber revolve by means of roller chain 7 which drives the shaft 12 through sprockets mounted thereon. At the outer end of the cylindrical chamber is an opening 8 which allows the mixture to pass into an adjacent container 9.

Plaintiffs' expert witnesses testified that in the operation of defendant's apparatus water is introduced under pressure into pipe 3 by means of a pressure pump and is discharged at high velocity through the seven openings 4 in such pipe; that it travels downwardly and approximately parallel to the side of the hopper next to pipe 3, in the throat between the hopper and the cylindrical chamber; that the hopper is kept filled with cement; that such streams of water create areas of reduced pressure; that the suction force created thereby draws the dry cement into such high velocity streams of water; that the water and cement are mixed by the impact and shock of the particles of water in such streams upon the particles of cement; that such mixing is substantially completed in the space between pipe 3 and the cylindrical chamber; that the proportioning and mixing of the cement and water is effected by the high velocity streams of water; and that the auger 5 and the shaft 12, and the paddles 6 serve no useful purpose.

They further testified that they made certain tests of defendant's apparatus; that they operated it first with the driving chains removed and then with the shaft and paddles wholly removed, and that in each instance it proportioned and mixed the cement and water as efficiently and rapidly as when the shaft and paddle wheels were driven normally;

that such tests demonstrated that such streams of water form practically a sheet of water moving at high velocity downwardly and approximately parallel to the side of the mixer in which the water pipe is situated, that they create areas of reduced pressure which draw in the dry cement, and that they hydrate it by the impact and shock of the water.

They further testified that they saw one of defendant's machines on a cementing job mixing and delivering neat cement with its usual speed and efficiency, while the power which moves the shaft and auger was shut off.

There was testimony to the contrary, but the trial court, who heard the witnesses testify and had the opportunity to observe their demeanor while testifying, found the facts in accordance with the testimony of plaintiffs' witnesses.

The finding of a chancellor made on conflicting evidence is presumptively correct and will not be set aside unless some serious mistake has been made in the consideration of the evidence. Crawford v. Briant (C. C. A. 10) 53 F.(2d) 754; New York Life Ins. Co. v. Griffith (C. C. A. 10) 35 F.(2d) 945; Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356; Fienup v. Kleinman (C. C. A. 8) 5 F.(2d) 137; Rogers v. Jones (C. C. A. 10) 40 F.(2d) 333; Blettner v. Gill (C. C. A. 7) 251 F. 81; Diamond Patent Co. v. Webster Bros. (C. C. A. 9) 249 F. 155.

Furthermore, from a careful examination of the record, we are convinced that the trial court correctly resolved the facts in favor of plaintiffs.

We conclude therefore that defendant employs high velocity streams of water to proportion and mix the water and cement and to discharge the hydrated cement from the mixer, as described in the claims set out in Note 1, and that it infringes such claims.

In the operation of defendant's apparatus in cementing an oil well after the mixture has been deposited in the container 9, it is drawn therefrom by the delivery pump and forced down through the well casing to the point of use.

Plaintiffs' witnesses testified that in the operation of defendant's device in the cementing of an oil well, the operator maintains a synchronous relation between the speed of the mixing device and the speed of the conveying device by regulating the water pressure and delivery pressure generated by the pumps. This of course would only be possible if the proportioning of the cement and water was effected by high velocity streams.

Here again the trial court found the facts in accordance with the testimony of plaintiffs' witnesses and in accordance, we think, with the great weight of the evidence.

Thus, it will be seen that defendant employs the combinations of the methods and means described in the claims set out in Note 2, and that the elements of such combinations perform the same functions and accomplish the same result as the elements of such claims.

We therefore conclude that the methods and device employed by defendant infringes the several claims set out in Notes 1 and 2.

We hold that such claims of the patents in suit are valid and infringed. We construe the decree below as so adjudging and as not passing upon the other claims.

The decree is affirmed.